**Tammy Rose WIGGINS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 06–03–00216–CR.**

Court of Appeals of Texas,
Texarkana.

Submitted Oct. 27, 2004.

Decided Nov. 18, 2004.

---

Ebb B. Mobley, Longview, for appellant.

James P. Finstrom, Marion County Dist. Atty., Jefferson, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Justice CARTER.

Tammy Rose Wiggins was convicted of capital murder and sentenced to life in prison. Her only complaint on appeal is that the admission of hearsay statements made by her co-conspirator, Glen Bethany, to testifying witnesses Mark Fish, Teresa Miller, and Wendy Bunn Troquille, violated her Confrontation Clause rights as articulated in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Finding the co-conspirator statements on which she bases her appeal nontestimonial, we overrule Wiggins' three points of error and affirm the trial court's judgment.

Wiggins does not attack the sufficiency of evidence at trial, so a detailed recitation of the facts of this case is not necessary. An in-depth summary of the evidence of this crime may be found in this Court's opinion in *Bethany v. State*, 06–03–00185–

CR, 152 S.W.3d 660, 2004 WL 2608264 (Tex.App.-Texarkana 2004).

In brief, the evidence adduced at trial showed that Tammy was involved in an extra-marital affair with Bethany. Tammy and Bethany conspired to kill Tammy's husband, Randy Wiggins. Randy had filed for divorce from Tammy and intended to seek custody of their young child. In exchange for his help in the murder, Bethany was to receive from Tammy the title to Randy's Lincoln automobile. Randy and Tammy left a bar near the Louisiana/Arkansas/Texas state lines, and pulled off the road near an oil well in Cass County, Texas. Bethany waited there until Tammy and Randy arrived, then Bethany hit Randy at least twice in the head with a hammer, and cut Randy's throat. Bethany put Randy's body in a large toolbox in a pickup truck Bethany had stolen; Bethany dumped the body on a county road in Marion County, then took the truck to Frierson, Louisiana, and set it ablaze.

### Co–Conspirator Statements

The evidence on which Tammy bases her *Crawford* complaints is as follows:

Teresa Miller was the live-in girlfriend of Mark Fish at the time of Randy's murder. She testified that Bethany and Tammy stayed with Miller and Fish. Miller heard Bethany and Tammy, in Miller's kitchen, talking about Bethany getting the title to Randy's car in exchange for killing Randy. Miller, while in the car with Tammy and Bethany, heard Tammy ask Bethany to kill Randy so Tammy and Bethany "could be together." Miller did not hear Bethany respond to Tammy's statement, but did hear Tammy say that, if Bethany did not kill Randy, Tammy would do it herself. After Tammy got out of the car, Bethany told Fish and Miller he would not kill "any man for a woman."

Miller also said that Bethany told her specifics about the murder and that he asked her to take him to recover the hammer used in the killing. After seeing coverage of Randy's death on the local news, Bethany asked if Miller knew who the victim was. After Miller answered that she did not know him, Bethany told her the victim was Tammy's husband. He described to Miller that Tammy and Randy left a bar and came to a clearing in the woods, where Bethany waited. Bethany said he struck Randy in the head with a ball peen hammer, stabbed him, cut his throat, put his body in the toolbox, drove seventy-five miles away, and dumped the body. He took the title to the Lincoln from Randy's wallet. Bethany then put his bloody clothes in the front of the truck, took the truck to another location, and burned it. The description Bethany gave of the murder had not been mentioned on the news broadcasts. After telling all this to Miller, he asked her to go with him to look for the hammer.

Fish testified Bethany described the murder, using hand gestures to indicate cutting motions to the throat. Bethany said the song, "Three Times a Lady" was his code for the murder, because he had cut Randy's throat three times. Bethany asked Fish to help provide an alibi for Bethany and Tammy. Fish testified he heard Bethany and Tammy talking in the kitchen; Bethany later told Fish he had been "coaching" Tammy in case she was questioned by police detectives.

Troquille testified that Bethany told her specifics about the murder event and that he asked her to take him to recover the hammer used in the killing. Bethany told her the murder had been planned and Tammy had asked him to participate. According to Troquille, Bethany said he waited at a prearranged site, where Tammy arrived with Randy. Bethany said he struck Randy in the head with a ball peen hammer, and the hammer flew out of his

grip after the second blow. Bethany told Troquille that "he was not going down for this crime alone" and afterward sent Tammy back to the bar to establish an alibi. Bethany did not ask for Troquille's help in formulating an alibi, but said that, if she would take him back to the murder scene and look for the hammer, she "would never have to work another day in [her] life." Troquille said that the details Bethany told her had not been mentioned on television news reports and that he had thrown in a lake the knife used in the crime.

### Nontestimonial Statements Not Barred by Crawford v. Washington

■ Wiggins's sole complaint is that the statements made by Bethany to Fish, Miller, and Troquille are barred by *Crawford.* We disagree. The United States Supreme Court in *Crawford* held that the Confrontation Clause in the Sixth Amendment to the United States Constitution barred from admission into evidence testimonial statements of a witness who did not appear for trial unless the witness was unavailable to testify and the defendant had had a prior opportunity for cross-examination. *Crawford,* 124 S.Ct. at 1365. *Crawford* concerns testimonial statements. Co-conspirator statements made in the furtherance of a conspiracy are nontestimonial. *Crawford,* 124 S.Ct. at 1367 ("[m]ost of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy"); *United States v. Reyes,* 362 F.3d 536, 541 (8th Cir.), *cert. denied, Burton v. United States,* —— U.S. ——, 124 S.Ct. 2926, 159 L.Ed.2d 826 (2004).

Appellant is correct that *Crawford* "leave[s] for another day . . . a comprehensive definition of 'testimonial.' " *Crawford,*

124 S.Ct. at 1374. However, the Court did note that "the term covers . . . at a minimum . . . prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." *Id.*

■ The Second Circuit Court recently construed *Crawford* as it pertains to co-conspirator statements. "[S]tatements cited by the Court [in *Crawford* ] as testimonial share certain characteristics; all involve a declarant's knowing responses to structured questioning in an investigative environment or a courtroom setting where the declarant would reasonably expect that his or her responses might be used in future judicial proceedings." *United States v. Saget,* 377 F.3d 223, 228 (2d Cir.2004).[1] In *Saget,* a co-conspirator disclosed inculpatory statements to a confidential informant. Noting *Crawford's* specific caveat that it only pertains to testimonial statements, the Second Circuit Court pointed out that the co-conspirator in *Saget* made statements to one he thought was an ally or friend, and there was no evidence the co-conspirator was trying to shift blame away from himself. In this case, Bethany's statements are clearly nontestimonial. As in *Saget,* they were not made in a setting where it might reasonably be expected the statements would be used in judicial proceedings.

Even though we have found these statements to be nontestimonial, we must still determine the application of the Confrontation Clause concerning nontestimonial statements. The Supreme Court did not specifically resolve this issue, stating "[w]here nontestimonial hearsay is at is-

---

**1.** Affirmed at *Saget,* 108 Fed.Appx. 667, 2004 U.S.App. LEXIS 18745 (2d Cir., Sept. 3, 2004).

sue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." *Crawford*, 124 S.Ct. at 1374. A reasonable interpretation of *Crawford* would exempt all nontestimonial statements from any Confrontation Clause scrutiny. Several courts have held that nontestimonial statements are still governed by *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). *See Saget*, 377 F.3d 223; *Horton v. Allen*, 370 F.3d 75, 84 (1st Cir.2004); *People v. Cage*, 120 Cal.App.4th 770, 782, 15 Cal.Rptr.3d 846 (Cal.Ct.App. 2004); *State v. Manuel*, 685 N.W.2d 525 (Wis.Ct.App.2004) ("we proceed, in an abundance of caution, to analyze Manuel's confrontation clause claim under the *Roberts* analysis").

■ In the context of a Confrontation Clause analysis, *Roberts* authorized the introduction of a hearsay statement if it bore sufficient "indicia of reliability." *Roberts*, 448 U.S. at 66, 100 S.Ct. 2531. A hearsay statement is per se reliable under the Confrontation Clause if it falls within a "firmly rooted" exception to the hearsay rule. *White v. Illinois*, 502 U.S. 346, 356, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992). Even applying the *Roberts* test, we hold these nontestimonial statements were admissible.

■ Here, Bethany made statements that were significantly self-inculpatory. The Texas Court of Criminal Appeals has found statements against one's penal interest to be "extremely reliable." *Dewberry v. State*, 4 S.W.3d 735, 753 (Tex.Crim.App. 1999). Further, co-conspirator statements are recognized as a firmly rooted hearsay exception. *Bourjaily v. United States*, 483 U.S. 171, 183, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); *Bailey v. State*, 804 S.W.2d 226, 231 (Tex.App.-Amarillo 1991, no pet.).

■ Since co-conspirator statements are not testimonial, the Confrontation Clause does not give the defendant the right to cross-examine a person who does not testify at trial and whose statements are introduced under the co-conspirator hearsay exclusion. *Reyes*, 362 F.3d at 540–41, *citing White*, 502 U.S. at 356, 112 S.Ct. 736.

Finally, the two cases Wiggins cites in support of her argument that *Crawford* and the Confrontation Clause bar the testimony of Fish, Troquille, and Miller are inapposite. *Brooks v. State*, 132 S.W.3d 702 (Tex.App.-Dallas 2004, no pet. h.); *Hale v. State*, 139 S.W.3d 418 (Tex.App.-Fort Worth 2004, no pets.). Both involve statements from a codefendant (Brooks) or accomplice (Hale) which were written and given to police during custodial interrogations. Clearly, those statements were testimonial, as contemplated by *Crawford*, and not comparable to the statements in the instant case.

Wiggins' three points of error are overruled. We affirm the judgment.