In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-03-00185-CR
______________________________


GLEN ALLEN BETHANY, JR., Appellant
 
V.
 
THE STATE OF TEXAS, Appellee


                                              

On Appeal from the 276th Judicial District Court
Marion County, Texas
Trial Court No. F12,730


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Ross


O P I N I O N

          Glen Allen Bethany, Jr., was convicted of capital murder by a Marion County jury.
The State waived the death penalty, and Bethany was sentenced to life in prison. See
Tex. Pen. Code Ann. § 12.31(a) (Vernon 2003). On appeal, Bethany complains that (1) the
trial court erred by submitting a single application paragraph charging the jury in the
disjunctive on two methods of committing capital murder, and (2) the evidence is factually
insufficient to support Bethany's conviction. We overrule both points and affirm the trial
court's judgment.
The State's Evidence
          On Saturday, March 17, 2001, Randall Dupree and his wife went to an oil well site
in Cass County where Mr. Dupree's job was to daily check the oil well equipment. As they
were leaving, he saw a "huge amount of blood" on the ground. They got out of the truck
and looked closer; they found a necklace, a quarter, and a footprint in the bloody dirt. A
crushed pack of Marlboro Red cigarettes, with blood on the pack, was also found in the
immediate vicinity. They also saw a ball-peen hammer a short distance from the bloody
spot. There were other footprints and marks on the ground, indicating a struggle had taken
place, "like two bulls had been fighting." Scott Jester of the Cass County Sheriff's Office
arrived to investigate; he gathered blood, which was later submitted to the Southwestern
Institute of Forensic Science. 
          On Monday, March 19, 2001, before 3:00 p.m., Jesse Wilder, a gas measurement
technician for Reliant Energy, found a body on the side of a county road in Marion County. 
The body, ultimately identified as that of Charles Randall Wiggins (Randy), was bent in a
somewhat fetal position. The medical examiner testified the posture was consistent with
the body having been confined in a restricted space for approximately two hours.


 Several
wounds were observed around Randy's neck, but there was scant blood around the body. 
The medical examiner testified Randy had sustained a blow to the head and several stabs
to the neck, one of which opened the jugular vein. The deep wound to Randy's head was
consistent with a blow from a ball-peen hammer. In the head wound, inside a piece of
bone pushed inward from the level of the skull, was a piece of blue synthetic material. 
There were multiple contusions and abrasions to Randy's torso and clavicle area, as well
as bruising and injuries to his face, and his larynx had been shattered. The blood
discovered at the oil well site in Cass County was found to be Randy's, leading
investigators to the conclusion Randy had been killed at the oil well property and his body
then moved to the Marion County location.
          At about 9:30 a.m. on the same Saturday the patch of bloody ground was
discovered at the Cass County oil well site, Adam Ewing, of the DeSoto Parish Sheriff's
Office, responded to a report of a burning truck in Frierson, Louisiana. That truck was later
identified as one reported stolen from Jason Gaspard of Atlanta, Cass County, Texas. His
champagne-colored Ford F150 truck was stolen sometime during the evening of March 16
or the early morning hours of March 17. Gaspard, per his habit, had left the keys in the
truck. Gaspard's wife was friends with Tammy Wiggins, Randy's wife. The truck had a
large toolbox in the back, running the width of the bed, which was large enough to
accommodate the body of a person. 
          After the fire was extinguished and the truck could be investigated, Mark West, of
the Atlanta Police Department, and Ray Copeland, investigator for the Cass County
Sheriff's Office, gained access to the cab.


 A small mound in the cab of the truck was
found to have been protected from the fire by the melted glass and plastic. In the mound
was a pair of partially burned Tommy Hilfiger tennis shoes, a piece of a garbage bag, a
piece of a red T-shirt, a black wallet (subsequently identified as having belonged to Randy),
and a Swiss Army watch. In the toolbox was a leather jacket and blood. In the bed of the
truck, not destroyed by fire, was a Dallas Cowboys baseball cap. 
          The record shows that, within two months before Randy's demise, he had filed for
divorce from Tammy and announced his intention to seek custody of the couple's young
child. 
          On the night before he was killed, Randy's uncle, David Blizzard, saw the title to
Randy's Lincoln automobile in Randy's wallet. Blizzard testified that, on Friday night,
March 16, 2001, he dropped off Randy at the Wooden Indian, a bar in Queen City. On the
way to the bar, they stopped at a gasoline station and Randy purchased a pack of
cigarettes in a red box, possibly Marlboro Reds or a generic brand in a red box. 
          While Randy was at the bar, Tammy arrived. Robin Moore, who was working at the
Wooden Indian and was a friend of Randy, observed the couple from a distance and said
they appeared to be arguing. Shortly thereafter, the couple left and Randy told Moore they
were going to the Magnolia Club, a bar in Louisiana. Moore remarked she thought it
unusual that Randy left a half pitcher of beer at his table. 
          The couple was seen at about 11:00 p.m. that evening at a store in Atlanta, Texas. 
They were next seen at the Magnolia Club. Rose Sullivan, the Magnolia Club's
proprietress, said she was familiar with the couple, having seen them regularly in the club. 
They came in Friday night between 11:00 p.m. and midnight. Randy purchased drinks,
and the couple went to another room in the club where Rose assumed they were playing
pool. About thirty minutes to an hour later, Tammy came to Rose, asking if she had seen
Randy. Rose said Tammy asked her on three separate occasions if she had seen Randy,
as Rose was moving from area to area of the bar, tending to her duties. Tammy told Rose
that Randy had left with four men whom she did not know. Rose questioned Tammy about
this and thought it strange. After a while, Tammy left and told Rose that, should she see
Randy, to tell him she had gone back to his mother's house, where Randy lived and where
Tammy often stayed.


 
          Teresa Miller testified Bethany had lived with her and her boyfriend, Mark Fish, and
it was not uncommon for Fish to give Bethany clothes. Miller specifically remembered that
Fish had given Bethany a pair of Tommy Hilfiger shoes and a Ducks Unlimited cap, as well
as a Swiss Army watch. She identified items at trial, introduced into evidence by the State,
as a watch, red T-shirt, and Tommy Hilfiger shoes that either were the same or very similar
to ones Mark had given or (in the case of the T-shirt) loaned to Bethany. 
          In the week before Randy was killed, Miller was driving a car, with Bethany and
Tammy riding as passengers. Miller heard Tammy ask Bethany to kill Randy and say that,
if he did not, Tammy would do it herself or find someone to do it. Miller heard Bethany say
he wanted the title to Randy's Lincoln automobile. 
          Bethany told both Miller and Wendy Bunn he had killed Randy. Both Miller and
Bunn testified that, a few days after Randy was killed, Bethany was very interested in
watching all broadcasts of the local news. He had never before shown an interest in
watching the news. Miller and Bunn both testified that, when the identity of Randy's body
was reported on television, Bethany looked at Tammy. At this point, their accounts differ
slightly.
          Miller testified Bethany described the murder to her as follows: On the night of the
murder, Randy and Tammy had driven to meet him at some woods. When Randy got out
of the car, Bethany struck him once in the head with a hammer. Randy did not fall, so
Bethany struck him again. This time the hammer became lodged in Randy's head, and
Bethany had to pull it out.


 The record is not clear as to whether the hammer flew out of
Bethany's hand or the head of the hammer flew off the handle.


 Bethany then cut Randy's
throat. Bethany told Tammy to go back to the bar. He then drove seventy-five miles to
dump Randy's body, and then took the truck to Frierson, Louisiana, where he burned it. 
Miller testified Bethany asked her to take him to look for the hammer at the murder scene,
which she refused to do. Miller said that Bethany never mentioned Jeffery Lynch, Tammy's
brother, as having any involvement in the murder and that it was clear Bethany was telling
her he, Bethany, had killed Randy.


  
          Bunn testified that, after the news report on television, Bethany told her details of
the murder not mentioned on the report. He told her that he, Randy, and Tammy were at
an "oil dirt road" and that, when Randy got out of the car, he struck him on the head with
a ball-peen hammer, stabbed him, and cut his throat. He said Tammy then left, he
dumped the body, and took the truck to Frierson, Louisiana, and burned it. He told Bunn
he threw the knife used in the murder into a lake, "that if they wanted it, they would have
to dive for it." Bethany said that it was Tammy's idea to kill Randy and that he "was not
going down for this crime by himself."


 
          Sharee Camp is the ex-wife of Ernie Camp. Ernie regularly supplied
methamphetamine to Bethany. Although divorced, Sharee testified she often visited
Ernie's house in Shreveport, Louisiana. Late Friday night, March 16, or early in the
morning hours of Saturday, March 17, when she was at Ernie's house, Bethany arrived at
the door covered in blood from "his head to his knees," including his face, hair, shirt, and
jeans. Bethany told her he had been in a fight, but she did not see any injuries on his
body, even after he had bathed. Ernie gave Bethany clothes to change into and a garbage
bag, into which Bethany put his bloody clothes. Sharee testified Bethany arrived in a
"brownish" Ford F150 with a toolbox in the bed. 
          Mike Smith and John Mounts testified they had been incarcerated in the Cass
County jail with Bethany, where Bethany admitted killing Randy. Smith was in jail for drugs
and burglary. He testified Bethany bragged about killing Randy. Bethany told Smith he
had been dating Tammy and that, according to the plan, Bethany and Lynch stopped the
car Randy and Tammy were in, and while Lynch and Randy were fighting, he, Bethany,
struck Randy on the head with a hammer. Bethany told Smith that the second time he
struck Randy with the hammer, the hammer lodged in Randy's skull and he put his foot on
Randy and pulled the hammer out; when he did, the hammer "flew out of his hand." He
then stabbed Randy. Bethany told Smith Randy's body was put in a toolbox in the back
of a pickup truck. 
          Mounts, on community supervision for burglary and assault, had testified in
Bethany's defense at a previous trial of this case. At that trial, Mounts said Bethany told
Lynch (also in the Cass County jail at the time), in front of Mounts, that Lynch should tell
the truth about the murder of Randy. In response, according to Mounts, Lynch dropped
his head and said nothing. In the instant trial, Mounts said Bethany "pretty much full
fledged admitted" killing Randy. Mounts said Bethany told him he and Lynch had flagged
down the car Tammy and Randy were in, and while Lynch and Randy were fighting, he,
Bethany, struck Randy on the head with a ball-peen hammer. Bethany then stabbed
Randy, and he and Lynch dumped the body. Tammy, according to Mounts' rendition from
Bethany, was present when they set the truck on fire. 
Defense Evidence
          The defense's case-in-chief began with Tina Passmore, who was serving time in
prison for assault on a public servant, forgery, and credit card abuse. She testified that she
had many conversations with Copeland in the past and that, in one such conversation,
Copeland told her Lynch had confessed to killing Randy. On rebuttal, Copeland denied
this. 
          Bethany called Darren Kirkwood, incarcerated for prohibited sexual contact. 
Kirkwood said he also had been in the Cass County jail with Bethany and Lynch, when
Bethany said to Lynch, "You killed Randy Wiggins just like you did Donald Scruggs." 
According to Kirkwood, Lynch shook his head indicating "yes" and apologized, then walked
away. 
          Martel McQuery, in prison for driving while intoxicated, said he was present at a
conversation between Lynch and Bethany in the Cass County jail. McQuery said that he
heard Lynch say he was sorry for getting Bethany in trouble and that it was Lynch's "fault
[Bethany] was in all this," to which Bethany said, "You ought to go ahead and tell these
people what's right." McQuery said Lynch "just confirmed and shook his head." 
          Bethany testified in his own defense. He denied killing Randy. He said that Tammy
was pregnant with his child at the time of Randy's murder and that a few days before the
murder, Tammy asked Bethany to kill Randy, saying, "[I]f you won't kill Randy, I'll find
someone else to do it or do it myself." Bethany admitted this was said in a car in the
presence of Miller and Fish while they were taking Tammy back to Randy's house. 
Bethany said that, after Tammy was dropped off, he told Miller and Fish he would never
"kill any man for any woman for any reason." 
          To explain his bloody appearance when he arrived at Ernie's house, Bethany, an
admitted car thief, testified he had been scouting vehicles to steal that were parked on
parking lots in Shreveport, Louisiana. He said an intoxicated individual at one of the
parking lots accused him of looking at his wife and started a fight with him. Bethany
testified this man's wife hit him in the face with a beer bottle. Although this blow did not
break the skin, it did cause a bloody nose. He testified his nose bled profusely as he drove
back to Ernie's house, where he showered and put his bloody clothes in a garbage bag. 
Bethany said he put the garbage bag in the stolen blue Ford he had been driving. He
could not account for what happened to it after that. 
          Bethany admitted taking Gaspard's Ford truck, with the toolbox in back, to Frierson,
Louisiana, and burning it. He said that, as he left Ernie's house in Shreveport, he
coincidentally ran into Lynch, who was driving Gaspard's champagne-colored F150. Lynch
asked him to trade the champagne Ford's radio and the tools in the back of that truck to
Ernie for methamphetamine. Bethany testified Lynch gave him the title to Randy's Lincoln
at this time, as partial payment for other methamphetamine Bethany had previously
secured for Lynch from Ernie. Lynch and Bethany traded trucks because, according to
Bethany, Lynch had just stolen the champagne Ford in Texas and did not want to drive it
back to Texas. When Lynch gave him the truck, Bethany noticed blood in the bed and in
the toolbox under a leather jacket. Fearing that Tammy and Lynch had killed Randy and
that his possession of the truck could implicate him, Bethany decided to burn the truck and
thereby destroy any evidence that could implicate Tammy. Bethany was concerned for
Tammy's well-being and that of his child, whom she carried.


 
          Bethany, previously convicted of unauthorized use of a vehicle in Louisiana, claimed
to be a master car thief. He testified he wanted Tammy to obtain the title to a Lincoln car
owned by Randy because Bethany had access to another Lincoln. With the title to Randy's
Lincoln, Bethany could substitute vehicle identification numbers and alter the titles, making
the newer Lincoln, which Bethany was sure he could steal, safely transferable. Bethany
had been asking Lynch for the title for some time, and eventually told Tammy she should
get the title for him as she "owe[d] him that much." He said that statement referred to
debts owed Ernie for methamphetamine Bethany had acquired for Tammy and himself. 
Bethany also testified he had tried to get the title from Lynch to pay for drug debts incurred
by Bethany for drugs acquired on Lynch's behalf. 
No Error in the Single Application Paragraph of the Court's Charge
          Bethany complains about the trial court's charging the jury in the disjunctive with
regard to how he committed capital murder. The Penal Code provides that a person
commits capital murder when, among other ways, such person "intentionally commits the
murder in the course of committing or attempting to commit . . . robbery . . ." or "commits
the murder for remuneration or the promise of remuneration or employs another to commit
the murder for remuneration or the promise of remuneration." Tex. Pen. Code Ann.
§ 19.03(a)(2), (3) (Vernon Supp. 2004–2005). 
          The indictment in this case alleged Bethany committed capital murder:
on or about the 17th day of March, A.D. 2001 . . . [when he] knowingly and
intentionally cause[d] the death of . . . Charles Randall Wiggins, by hitting
[Wiggins] in the head with a hammer and stabbing [Wiggins] in the throat
with a knife, . . . and . . . [Bethany] . . . did then and there cause the death of
[Wiggins] for remuneration and the promise of remuneration . . . .

          The second paragraph of the indictment likewise charged Bethany with capital
murder when "in the course of attempting to commit and committing robbery of [Wiggins],
[Bethany] did then and there intentionally and knowingly . . . murder . . ." by hitting Wiggins
in the head with a hammer and stabbing him in the neck with a knife. 
          The trial court's charge to the jury read, in pertinent part:
if you either believe from the evidence beyond a reasonable doubt, that on
or about March 17, 2001 . . . the defendant, Glen Allen Bethany, Jr. did then
and there intentionally and knowingly cause the death of . . . Charles Randall
Wiggins, by hitting [him] in the head with a hammer and stabbing [Wiggins]
in the throat with a knife, . . . for remuneration and [sic] the promise of
remuneration from Tammy Wiggins, . . . or if you believe from the evidence
beyond a reasonable doubt, that on or about the17th day of March, 2001 . . .
[Bethany], in the course of attempting to commit and committing robbery . . .
did then and there intentionally and knowingly commit murder by causing the
death of . . . [Wiggins] by hitting [Wiggins] in the head with a hammer and
stabbing [Wiggins] in the neck with a knife . . . you will find the defendant,
Glen Allen Bethany, Jr., guilty of capital murder as charged in the indictment. 

The jury returned a verdict stating, "We, the Jury, find the defendant, Glen Allen
Bethany, Jr., guilty of the offense of CAPITAL MURDER, as charged in the indictment."
          Bethany made no objection to the court's charge before it was read to the jury. He
claims, however, that error in the charge cannot be waived. To an extent he is correct; we
first examine the record to determine whether any error occurred. If there is error, the
preservation or lack thereof determines the harm analysis we must conduct. See Grider
v. State, 139 S.W.3d 37, 38–39 (Tex. App.—Texarkana 2004, no pet.). We first address
whether there was error in the trial court's charge.
          Our disposition of this point is controlled by Kitchens v. State, 823 S.W.2d 256 (Tex.
Crim. App. 1991). There, the Texas Court of Criminal Appeals held that, "It is appropriate
where the alternate theories of committing the same offense are submitted to the jury in
the disjunctive for the jury to return a general verdict if the evidence is sufficient to support
a finding under any of the theories submitted." Id. at 258, citing Aguirre v. State, 732
S.W.2d 320, 326 (Tex. Crim. App. [Panel Op.] 1987) (op. on reh'g). 
          The instant case is analogous to Kitchens; the scenario is almost identical. Kitchens
was also charged with capital murder, alleged to have been committed by causing the
death of the victim by shooting or strangling the victim while committing robbery or sexual
assault. The jury was charged with these alternative means of committing the crime in a
single application paragraph. Id. at 257 n.1. As described above, a single application
paragraph was likewise submitted to the jury in the instant case. 
          Bethany attempts to distinguish Kitchens by saying that Kitchens is "bad law"
because that case relied on the United States Supreme Court's plurality decision in Schad
v. Arizona,


 yet the Kitchens decision failed to conduct a "meaningful (let alone critical)
analysis" of Schad. 
          Schad was charged in Arizona with murder, premeditated, or committed in the
course of committing or attempting to commit a felony. The United States Supreme Court
held that the mens rea necessary to prove both premeditated murder and felony murder
had been interpreted by the Arizona Supreme Court to bear the same "species of the
blameworthy state of mind required to prove a single offense of first-degree murder" and
that such an analysis "finds substantial historical and contemporary echoes." Schad, 501
U.S. at 640. 
          "Plainly there is no general requirement that the jury reach agreement on the
preliminary factual issues which underlie the verdict." Id. at 632, quoting McKoy v. North
Carolina, 494 U.S. 433, 449 (1990) (Blackmun, J., concurring). "[I]t has long been the
general rule that when a single crime can be committed in various ways, jurors need not
agree upon the mode of commission. That rule is not only constitutional, it is probably
indispensable in a system that requires a unanimous jury verdict to convict." Id. at 649–50
(Scalia, J., concurring) (citations omitted).  
          In support of his argument that this case is distinguishable from Kitchens, Bethany
cites Ngo v. State, 129 S.W.3d 198 (Tex. App.—Eastland 2004, pet. granted). We note
that, since Bethany filed his brief, the Texas Court of Criminal Appeals has granted review
of this case. Ngo was convicted of credit card abuse. He was indicted in three separate
paragraphs charging credit card abuse. The first paragraph charged Ngo with knowingly
and intentionally stealing a credit card; the second paragraph alleged he had knowingly
and intentionally received a credit card with the intent to use it, knowing it had been stolen;
and the third paragraph charged Ngo with using and presenting a credit card with the intent
to obtain a benefit fraudulently and with the knowledge that such use was without the
effective consent of the cardholder. Id. at 200. 
          The charge in Ngo's trial stated:
 
Now, if you find from the evidence beyond a reasonable doubt that
[appellant] on or about the13th day of December, 2002, did then and there
unlawfully, intentionally or knowingly steal a credit card owned by the card
holder, Hong Truong, with intent to deprive the cardholder of the property
and without the effective consent of the cardholder; or

If you find from the evidence beyond a reasonable doubt that [appellant] on
or about the 13th day of December, 2002, did then and there unlawfully and
knowingly receive with intent to use a credit card owned by card holder,
Hong Truong, knowing the credit card had been stolen; or

If you find from the evidence beyond a reasonable doubt that [appellant] on
or about the 13th day of December, 2002, with intent to obtain a benefit
fraudulently, did use or present to Hanh Nguyen a credit card knowing the
use was without the effective consent of the cardholder, Hong Truong,
namely without consent of any kind, and knowing that the credit card had not
been issued to the defendant, then you will find [appellant] guilty as charged
in the indictment.

Id. at 200 n.2. The Court of Appeals in Eastland reversed the conviction, finding that each
of the paragraphs in the indictment charged a distinct crime, and that the disjunctive used
in a single application paragraph was error, because credit card abuse committed by using
or presenting a credit card without the effective consent of the owner, stealing a credit card,
or receiving a credit card with intent to use the same knowing the card was stolen, were
three distinct crimes. Id. at 201. The court pointed out that the elements of credit card
abuse are different in Sections 32.31(b)(1) and 32.31(b)(4) of the Texas Penal Code. Id.
          Bethany also cites Francis v. State


 in support of his claim that the disjunctive
charging of alternative means of committing capital murder was error. There, the state
presented evidence of four incidents of indecency with a child by Francis: two incidents
involved touching the victim's breast; two involved touching the victim's genitals. The
charge (following the defense's motion for the state to elect) instructed the jury Francis
could be found guilty if he were found to have "engage[d] in sexual contact by touching the
breast or genitals of [the victim]." Francis, 36 S.W.3d at 124. Citing Vernon v. State,


 the
Texas Court of Criminal Appeals held the two incidents of sexual contact were distinct
criminal acts and not properly charged in a single disjunctive application paragraph. 
Francis, 36 S.W.3d at 124. 
          As noted in the Francis opinion, Kitchens and Schad, as well as the instant case all
involved the commission of one crime: the murder of one individual. Francis and Ngo
involved commission of distinct crimes on separate occasions. Kitchens is completely on
point in this case. One crime—capital murder—was committed by Bethany. Even more
to the point, whether Bethany committed murder for remuneration (or the promise of
remuneration) or committed murder in the course of robbing Randy, the remuneration
sought and the fruits of the robbery were the same: the title to Randy's Lincoln. In light
of the similarities between this case and Kitchens, and the pending review of Ngo, we find
Kitchens controlling. 
          No error occurred with regard to the court's charge in the instant case. Accordingly,
it is not necessary to conduct a harm analysis. See Almanza v. State, 686 S.W.2d 157,
172 (Tex. Crim. App. 1984) (op. on reh'g); Grider, 139 S.W.3d at 38–39.
The Evidence is Factually Sufficient to Support the Jury's Verdict 

          In reviewing the factual sufficiency of the evidence, we are required to determine
whether, considering all the evidence in a neutral light, the jury was rationally justified in
finding guilt beyond a reasonable doubt. Zuniga v. State, 144 S.W.3d 477, 484 (Tex. Crim.
App. 2004).
          The evidence, viewed in a neutral light, is not too weak to support the jury's finding
of guilt beyond a reasonable doubt. Nor can we say, when weighing the evidence
supporting and contravening the conviction, that the contrary evidence is strong enough
that the State could not have met its burden of proof. 
          Bethany arrived, by his own admission, at Ernie's house late at night covered in
blood, yet showing no visible injuries. He was asked, in the hearing of two testifying
witnesses, to kill Randy and claimed responsibility for doing so to several people. In his
admissions to Miller and Bunn, days after the murder, he gave details not released on
television news reports. He admitted to at least four people (Miller, Bunn, Smith, and
Mounts) that he drove Gaspard's truck to Frierson, Louisiana, and burned it. His watch and
shoes were found in the burned hull of the stolen pickup. The Tommy Hilfiger shoes he
admitted owning (but denied wearing on the night of the murder) had Randy's blood on
them, and their soles strongly resembled the imprints found at the scene of the murder. 
Bethany's watch, found in the burned truck, had Randy's blood on it.


 His girlfriend,
Tammy,


 was friends with the wife of the owner of the stolen truck, which provided
Bethany with knowledge of the truck, its large toolbox, and the owner's propensity for
leaving the keys in the ignition. Bethany admitted being an accomplished car thief. He
also admitted having an ongoing affair with Tammy and claimed she carried his child. The
title to Randy's Lincoln was found in Bethany's wallet, and he had been heard on more
than one occasion to have said he wanted that title. He even admitted this in his testimony
and described how he planned to use that title in stealing another (presumably newer)
Lincoln. Considering all the evidence in a neutral light, the jury was rationally justified in
finding guilt beyond a reasonable doubt.
          Other than slight discrepancies in testimony when compared to citations from the
previous trial, the only contrary proof was that of other witnesses saying they had heard
that Lynch had confessed to killing Randy, or that Lynch had apologized to Bethany for
getting him "in all this trouble," or that he was having to go through all this, and Bethany's
own denials, which the jury was free to accept or reject. Passmore, McQuery, and
Kirkwood were all prison inmates, and the jury was free to weigh their credibility and
testimony. When weighing the evidence supporting and contravening the conviction, the
contrary evidence is not so strong for us to determine the State could not have met its
burden of proof.  
          The evidence is factually sufficient to support the jury's verdict, and Bethany's
second point of error is overruled.
          We affirm the judgment.



                                                                           Donald R. Ross
                                                                           Justice

Date Submitted:      October 27, 2004
Date Decided:         November 18, 2004

Publish