Stephon **WALTER**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 06–04–00173–CR.

Court of Appeals of Texas, Texarkana.

Submitted Aug. 10, 2006.

Decided Nov. 15, 2006.

Jeff Harrelson, Harrelson, Moore & Giles, LLP, Texarkana, for appellant.

Michael Shepherd, Asst. Dist. Atty., Texarkana, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Chief Justice MORRISS.

Standing at the open side door of the almost deserted Outback Steakhouse in Texarkana late on the evening of August 31, 2003, Richard Markeil Henson held a bag containing approximately $800.00, which Stephon Walter[1] had taken from inside the restaurant and handed to Henson. Walter, after handing Henson the money—but still possessing a handgun Walter had borrowed for the purpose of robbing the restaurant—disappeared again into the restaurant, where three restaurant employees awaited. Henson next heard, through the open door, the employees begging for their lives—and then the sound of six gunshots. The three employees—general manager, Matthew Hines; manager and expectant mother, Rebecca Shifflett; and systems manager, Chrystal Willis—were shot and died where they lay.

Later, as Walter and Henson left the restaurant grounds with the money and the gun, they were the only two people alive who knew what had happened. But each of them told others.

Walter told Billy Ray Johnson, who claims to be the common-law husband of Walter's sister. According to Johnson's testimony, between 1:00 and 2:00 a.m. on September 1, Walter sought a private conversation with Johnson to discuss what had happened at the restaurant a short time earlier.[2]

Henson, on the other hand, told his brother, Roderick, the following morning, September 1. Roderick testified that Hen-

---

1. Walter began working at the Outback Steakhouse in September 2001 and was, by most accounts, a problem employee, having been fired by at least one manager, and perhaps by another prior manager as well. New general manager Matthew Hines decided to give him another chance, but he also fired Walter August 5, 2003, after continued problems. Since then, Walter had been working at Tyson Chicken and staying with a female friend in nearby Hope, Arkansas. He came to Texarkana to attend his sister's weekly party where he connected with Henson at some point. Henson, also, had been fired from Outback some months earlier. Walter and Henson planned to rob the restaurant. They left together in a Chevrolet Blazer that Walter had been borrowing from his sister. The two gained entry to the restaurant through a side door known by all of the employees to be defective.

2. Johnson testified that a very serious and nervous Walter admitted committing the robbery and shooting three people at the restaurant. Walter explained that Henson was with him at the restaurant. In response, Johnson advised Walter that Walter should have killed Henson, also, to ensure that Henson would not talk.

Johnson testified that, earlier on August 31, he had loaned Walter the loaded Lorcin semiautomatic .380 caliber handgun used in the murders. He testified that Walter asked him for the gun and left Johnson with the impression that he wanted the gun as protection against crime in his neighborhood. Later that day, Walter returned to Johnson and mentioned "do[ing] Outback." Johnson did not take the comment seriously until Walter returned a second time and continued to talk about robbing the Outback Steakhouse with the gun. Johnson then attempted to dissuade Walter from that idea and suggested Walter return the gun to Johnson. Walter did not return the gun.

Johnson further testified that, after Walter was arrested for the murders, Walter's mother—Johnson claims her as his mother-in-law—found the gun at Walter's apartment and destroyed it. Johnson also admitted that he initially perjured himself before the grand jury by attempting to provide an alibi for Walter, but that later he agreed to cooperate when the State agreed it would not pursue perjury or other charges against Johnson if he would testify in this case.

son told him about the events occurring August 31 at the restaurant.[3]

Both Walter and Henson were charged with capital murder in connection with the highly publicized murders. The trial court transferred Walter's case to Collin County due to the extensive publicity of the murders. The Collin County jury found Walter guilty of capital murder and assessed punishment at life in prison. The trial court sentenced Walter accordingly.

We affirm the trial court's judgment based on the following holdings on Walter's points of error:

(1) The trial court did not abuse its discretion by admitting testimony regarding statements by Henson that implicated both Henson and Walter.

(2) The trial court did not abuse its discretion when it excluded evidence of witness Johnson's prior murder and robbery convictions as impeachment.

(3) The trial court did not abuse its discretion by changing venue to Collin County, a county which lies outside any judicial district adjoining the Fifth Judicial District.

(4) The trial court did not err when it denied Walter's motion to quash the indictment when the record shows that unauthorized people were present during grand jury proceedings.

(5) The trial court did not err when it granted the State's challenges for cause concerning five jurors who expressed that they would hold the State to a higher standard of proof in a case in which the death penalty is sought.

(6) The trial court did not err when it refused to include an instruction on aggravated robbery.

*(1) The Trial Court Did Not Abuse Its Discretion by Admitting Evidence Regarding Henson's Statements*

As we have mentioned above, Henson's brother, Roderick, testified at trial to various things Henson told him about the August 31 events at the Outback Steakhouse. Walter objected to Roderick's testimony in terms of both hearsay and a violation of the Sixth Amendment's Confrontation Clause. We first address his Confrontation Clause argument.

*(a) Crawford Not Applicable to Nontestimonial Statements*

■ We first look at Walter's argument in terms of the *Crawford* rule: testimonial statements of a witness who does not appear at trial are inadmissible unless that witness was unavailable to testify and the defendant had a prior opportunity for cross-examination. *See Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). We are aware that

**3.** Roderick was familiar with Walter and testified that Henson and Walter were acquaintances. Roderick further testified that, the morning following the murders, a nervous Henson told him about the events. Before Roderick heard anything about the murders, Henson told him that Walter and Henson had planned on "hit[ting] a lick," slang for committing a robbery, at the Outback Steakhouse. Henson explained to Roderick in their private conversation that Walter went into the back office, came out with a bag of money, and went back to the office to perhaps get keys to the safe. As Henson waited in the hallway, he heard voices pleading with Walter not to shoot and then heard six gunshots. Henson and Walter left in Walter's vehicle and split the money, amounting to approximately $400.00 each. Fearing that cameras may have filmed the two as they left the restaurant, Henson enlisted the help of Roderick to burn the clothing Henson wore that night. Later, Roderick suggested to Henson that he turn himself in and, after Roderick began fearing that he was becoming too involved himself, had his wife call the police and relay the information he had learned from Henson.

*Crawford* does impose restrictions in the application of certain hearsay exceptions. However, a major limitation of *Crawford* is that its application is limited to "testimonial statements."

Although the *Crawford* opinion does not provide a comprehensive definition of "testimonial," it does indicate that the term covers "ex parte in-court testimony or its functional equivalent ... extrajudicial statements contained in formalized testimonial materials" such as "prior testimony at a preliminary hearing, before a grand jury, or at former trial; and ... police interrogations." *Id.* at 52, 124 S.Ct. 1354. While there is no indication that these examples represent an exhaustive list, *Crawford's* description lends support to our previous reading of *Crawford* that "testimonial statements" share the characteristics of involving a declarant's knowing responses to structured questioning in an investigative environment or courtroom setting where the declarant could reasonably expect that his or her responses might be used in future judicial proceedings. *See Wiggins v. State,* 152 S.W.3d 656, 659 (Tex.App.-Texarkana 2004, pet. ref'd) (holding *Crawford* did not apply to statements against interest made by co-conspirator to declarant's supposed friends; such statements nontestimonial).

■ The United States Supreme Court recently provided further guidance regarding statements that are considered "testimonial" for purposes of *Crawford. See Davis v. Washington,* —— U.S. ——, 126 S.Ct. 2266, 2273, 165 L.Ed.2d 224 (2006). The Court compared the statements found to be testimonial in *Crawford* to the statements in the *Davis* case and concluded that the portion of a 9-1-1 call at issue in *Davis* was nontestimonial. *Davis,* 126 S.Ct. at 2277. The Court pointed out that the declarant in *Davis* made the statements at issue during a crime in progress and for the purpose of summoning help.[4] *Id.* at 2276. The Court also observed that the declarant made the statement while still in a dangerous setting and in a frantic state of mind, rather than in the safety of a police interview room or another place of safety. *Id.* at 2277. So, from *Davis,* we learn that the timing, purpose, and setting of the statement can be relevant considerations when determining whether the statement is testimonial for the purpose of analysis under *Crawford.*

■ Here, Roderick's testimony shows that the conversation involved only the two brothers and took place at Henson's residence. Henson made the statements to his brother spontaneously and apparently in an attempt to enlist his brother's help in eluding identification. It seems that Henson spoke quite nervously with Roderick in an attempt to avoid ever being connected to the crime, leading us to conclude that Henson did not make these statements under circumstances from which a reasonable person might expect the statements to be used in a later criminal trial. Whatever the precise definition of "testimonial statements," it is clear that, here, coconspirator Henson's remarks in a private conversation with his brother only hours after the murders are not "testimonial statements"

---

4. The United States Supreme Court added the following distinction:

Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis,* 126 S.Ct. at 2273–74.

and, thus, fall outside *Crawford's* analysis. Henson "simply was not acting as a witness" when he spoke to his brother. *See Davis*, 126 S.Ct. at 2277.

■ Several courts, including this one, have held that nontestimonial statements are still governed by *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). *See Wiggins*, 152 S.W.3d at 660 (citing *United States v. Saget*, 377 F.3d 223, 228 (2d Cir.2004); *Horton v. Allen*, 370 F.3d 75, 84 (1st Cir.2004); *People v. Cage*, 15 Cal.Rptr.3d 846 (Cal.Ct.App. 2004); *State v. Manuel*, 275 Wis.2d 146, 685 N.W.2d 525 (2004)). Under *Roberts*, the introduction of a hearsay statement was permitted if it had sufficient "indicia of reliability." *See Crawford*, 541 U.S. at 52, 124 S.Ct. 1354; *Roberts*, 448 U.S. at 66, 100 S.Ct. 2531; *Wiggins*, 152 S.W.3d at 660. A hearsay statement is per se reliable under the Confrontation Clause if it falls within a "firmly rooted" exception to the hearsay rule. *White v. Illinois*, 502 U.S. 346, 356, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992).

### (b) Firmly–Rooted in Statement Against Penal Interest Exception

Roderick's testimony concerns Henson's out-of-court statements offered "to prove the truth of the matter asserted," that Walter committed the crime. *See* Tex.R. Evid. 801(d), 802. All seem to agree that this testimony is hearsay. We must determine whether it fits into an exception to the rule excluding hearsay—here, the statement against penal interest exception. Rule 803 provides a definition of a statement against interest:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against

another, or to make the declarant an object of hatred, ridicule, or disgrace, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. In a criminal case, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Tex.R. Evid. 803(24). As we pointed out in *Wiggins*, the Texas Court of Criminal Appeals has found statements against one's penal interest to be "extremely reliable." *See Dewberry v. State*, 4 S.W.3d 735, 753 (Tex.Crim.App.1999).

### (i) Sufficiently Self–Inculpatory

■ An admission against a codefendant declarant's interest can be admissible against the defendant so long as it is sufficiently against the declarant's interest to be reliable. *See Williamson v. United States*, 512 U.S. 594, 603, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994); *Dewberry*, 4 S.W.3d at 751; *Cofield v. State*, 891 S.W.2d 952, 956 (Tex.Crim.App.1994). At issue in *Dewberry* was testimony concerning statements made to third parties by appellant's brother/codefendant, Chris Dewberry. *See Dewberry*, 4 S.W.3d at 751. The Texas Court of Criminal Appeals concluded that testimony regarding Chris' statements were admissible against defendant John Dewberry because such statements using "we" sufficiently implicated Chris in the commission of capital murder. *See id.* Due to the self-inculpatory nature of the statements, the *Dewberry* court characterized the statements as reliable. *See id.*

■ Here, we examine similar testimony regarding Henson's statements to his brother. While it is true that Henson's statements seem to depict him as the less culpable one, by making such statements, Henson opened himself to criminal liability

at least for robbery, based on the admitted original purpose for Henson and Walter being at the restaurant that night.

Where a defendant conspired[5] to commit robbery that resulted in the murder of a sheriff's deputy, the Fourteenth Court of Appeals affirmed a capital murder conviction based on liability under Section 7.02(b) even when the defendant was not present at the scene of the murder. *See Longoria v. State*, 154 S.W.3d 747, 755 n. 6 (Tex.App.-Houston [14th Dist.] 2004, pet. ref'd). The *Longoria* court concluded that it should be anticipated that a murder would occur where evidence shows the defendant is aware that cohorts in a planned robbery are armed with guns. *See id.* at 756–57 n. 7; *see also Cienfuegos*, 113 S.W.3d at 489–90 (holding evidence legally sufficient to support capital murder conviction based on Section 7.02(b) when, after participating in kidnapping, appellant kept watch over kidnapped victims while coconspirator went elsewhere and fatally shot deceased); *Williams v. State*, 974 S.W.2d 324, 330 (Tex.App.-San Antonio 1998, pet. ref'd) (finding evidence factually sufficient to support capital murder conviction when jury could infer from evidence appellant knew at least one person involved in robbery was carrying gun and, therefore, record supported conclusion that murder reasonably foreseeable).

Here, by Henson's account, Walter drove the two men to and from the restaurant with the intent to commit aggravated robbery. The record suggests that, all the while, Henson knew that their plan was to commit robbery and that Walter had a loaded gun. Even though Henson may not have planned to actively participate in capital murder, the record supports the con-

clusion that his utterances were statements against his penal interests and were sufficiently self-inculpatory.

### (ii) Sufficient Corroboration of Statement

 No definitive test exists by which to gauge the existence of corroborating circumstances for purposes of Rule 803(24). *See Davis v. State*, 872 S.W.2d 743, 749 (Tex.Crim.App.1994); *Lester v. State*, 120 S.W.3d 897, 901 (Tex.App.-Texarkana 2003, no pet.). The burden lies with the party seeking to admit the statement, and the test is not an easy one; the evidence of corroborating circumstances must clearly indicate trustworthiness. *Davis*, 872 S.W.2d at 749. Any number of factors may be considered in this inquiry, including: (1) whether the guilt of the declarant is inconsistent with the guilt of the defendant, (2) whether the declarant was so situated that he or she might have committed the crime, (3) the timing of the declaration, (4) the spontaneity of the declaration, (5) the relationship between the declarant and the party to whom the statement was made, and (6) the existence of independent corroborating facts. *See Dewberry*, 4 S.W.3d at 751.

 Henson's admission to his brother regarding his involvement with the murders is not inconsistent with Walter's guilt. According to Henson, they both entered the restaurant with the intent to commit aggravated robbery. As discussed, the law will then apply to these facts to make Henson criminally responsible for capital murder. However, Henson's guilt with respect to these crimes does not lend itself to a conclusion that Walter is not guilty. In fact, only by implicating Walter in the

---

**5.** A person commits criminal conspiracy if, with intent that a felony be committed, he or she agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense. *See* TEX. PENAL CODE ANN. § 15.02(a)(1) (Vernon 2003); *Cienfuegos v. State*, 113 S.W.3d 481, 489–90 (Tex.App.-Houston [1st Dist.] 2003, pet. ref'd).

murders does Henson make himself criminally responsible.

Testimony of several relatives and acquaintances place Henson in the company of Walter the night of August 31. Henson and Walter left together late that night, making both of them clearly situated where they could have committed the crime. Henson told his brother that he was present at the Outback Steakhouse that night and had plans of participating in the robbery.

Additionally, the timing of Henson's statement to his brother lends itself to the trustworthiness of Henson's statements. The brother, Roderick, testified that, when he spoke with the nervous-acting Henson the morning after the murders, Roderick had not yet heard anything about the murders. At that point in time, Henson was not considered a suspect in the murders. Henson contacted Roderick and spontaneously offered the information. That is, Henson spontaneously offered the information and did not divulge the information simply in response to any questioning or suspicion. The fact that Henson spoke with his brother so soon after the murders suggests that Henson was upset and panicked, also lending to the trustworthiness of the statement.

■ Also relevant is the fact that Henson chose to speak to his older brother, a figure who would typically be sought for guidance or help. Generally, a statement is sufficiently trustworthy for purposes of Rule 803(24) when the statement is made to a relative. *See Lester*, 120 S.W.3d at 901–02; *White v. State*, 982 S.W.2d 642, 648 (Tex.App.-Texarkana 1998, pet. ref'd). In *Lester*, we pointed out that the Texas Court of Criminal Appeals had arrived at a similar conclusion when the appellant's out-of-court statements were at issue:

It should also be noted that the statements were made in the presence of appellant's brother ... and his sister-in-law and thus the speakers reasonably felt they could confide in them and had no motivation to lie or place the blame for the crime on someone else.

Therefore, we consider the fact that Henson spoke privately to his brother about the murders as a factor lending itself to the trustworthiness of the statement.

There is also independent evidence of the statement's trustworthiness. The State produced pictures of the barbeque pit in which Henson and Roderick burned the clothing to alleviate Henson's concerns about identification from surveillance. The State also introduced pictures of the money recovered in an amount and location consistent with Henson's account of the robbery and murders. We conclude the relevant factors clearly point to the trustworthiness of Roderick's testimony.

Since Henson's statements implicate him in capital murder and since the record provides significant corroboration that clearly indicates the trustworthiness of Henson's statements to his brother, we conclude that the trial court did not abuse its discretion by admitting Roderick's testimony regarding those statements. We overrule Walter's contentions to the contrary.

*(2) The Trial Court Did Not Abuse Its Discretion by Excluding Certain Prior Convictions of Witness Johnson as Impeachment*

■ Also as we have mentioned above, Johnson testified to various admissions and actions by Walter before, during, and after the events at the restaurant. During his trial testimony, Johnson was questioned regarding his substantial criminal history, including a 1985 sexual assault conviction, a 1992 drug-related conviction, and a 1992 possession of a firearm by a felon conviction. However, the trial court

did not allow Walter to inquire into Johnson's 1988 convictions for second-degree murder and aggravated robbery, concluding that such evidence was more prejudicial than probative. Walter argues the trial court abused its discretion by excluding this evidence.

■■■ Rule 609 governs the admission of prior convictions as impeachment evidence:

(a) General Rule. For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record but only if the crime was a felony or involved moral turpitude, regardless of punishment, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to a party.

(b) Time Limit. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.

Tex.R. Evid. 609. The decision to admit or exclude remote convictions under Rule 609 is within the trial court's discretion. *Theus v. State*, 845 S.W.2d 874, 876 (Tex. Crim.App.1992).

We, therefore, review for an abuse of discretion the trial court's decision that the probative value of admitting evidence of the 1988 convictions did not outweigh its prejudicial effect.[6] To determine whether the probative value of the evidence outweighs the prejudicial effect, we look to the *Theus* factors:

(1) the impeachment value of the prior crime, (2) the temporal proximity of the past crime relative to the charged offense and the witness' subsequent history, (3) the similarity between the past crime and the offense being prosecuted, (4) the importance of the ... testimony, and (5) the importance of the credibility issue.

*See id.* at 880; *Woodall v. State*, 77 S.W.3d 388, 395 (Tex.App.-Fort Worth 2002, pet. ref'd).

**6.** In 1986, Johnson was convicted of sexual assault and placed on probation. This probation was revoked in 1988 when Johnson was convicted for robbery and murder and sentenced to ten years' confinement. Johnson was paroled in 1992 only to return to prison months later after being convicted of possession of a controlled substance and possession of a firearm by a felon. For these 1993 convictions, he was sentenced to three years' confinement, to run concurrently with the remaining sentence from the 1988 convictions. Johnson was again paroled in 1995 and remained on parole until November 15, 2000. So, the record indicates that Johnson was not released from confinement for the 1988 convictions until either 1995 when he was paroled or 2000 when he was released from parole. *See* Tex. Gov't Code Ann. § 508.001(6) (Vernon 2004) (describing parole as a "discretionary and conditional release" that allows an inmate to "serve the remainder of the inmate's sentence under the supervision of the pardons and paroles division" and suggesting that parole is not a release from confinement for purposes of Rule 609 of the Texas Rules of Evidence). Under either calculation, the 1988 convictions were not remote convictions to be evaluated under the stricter "substantially outweigh" standard of Rule 609(b). Further, the 1993 convictions for possession of a controlled substance and possession of a firearm by a felon represent intervening felonies which would vitiate the remoteness of any prior convictions and place the older convictions back under the "outweigh" standard of Rule 609(a). *See Jackson v. State*, 11 S.W.3d 336, 339 (Tex. App.-Houston [1st Dist.] 1999, pet. ref'd); *Hernandez v. State*, 976 S.W.2d 753, 755 (Tex. App.-Houston [1st Dist.] 1998, pet. ref'd).

The impeachment value of prior crimes involving deception or moral turpitude is greater than for crimes involving violence. See *Theus,* 845 S.W.2d at 881; *Deleon v. State,* 126 S.W.3d 210, 215 (Tex. App.-Houston [1st Dist.] 2003, pet. dism'd). Violent crimes, in contrast, tend to have more of a prejudicial effect. See *Deleon,* 126 S.W.3d at 215. Here, certainly, second-degree murder and aggravated robbery are violent crimes, and their evidentiary value tends to be less than their prejudicial effect. With that in mind, we conclude that the first factor favors the trial court's decision.

We next examine the similarity between the past crime and the offense being prosecuted. This *Theus* factor appears to be more applicable when the witness is the defendant. The concern is that, when a testifying defendant's past offense is more similar to the one for which he or she is being tried, the more likely the jury will be to convict the defendant based on his or her pattern of past criminal conduct, rather than on the evidence of the charged crime. See *Theus,* 845 S.W.2d at 881. Here, the instant case involves charges against Walter alleging capital murder, which necessarily shares some common elements with the murder and aggravated robbery convictions sought to be used to impeach Johnson. The similarity between *Johnson's* prior convictions and the offense for which *Walter* was being tried suggest that the evidence of these prior offenses could have a prejudicial effect on the jury's consideration of the evidence presented against Walter and, instead, potentially shift blame or suspicion onto witness Johnson. This increased potential for prejudice weighs in favor of the trial court's decision.

The final factors concern, respectively, the importance of the testimony at issue and the importance of the credibility issue. Johnson's testimony regarding what Walter told him does seem to have a noticeable impact. However, his testimony was not the only evidence against Walter. So, while Johnson's testimony and, therefore, his credibility, are relatively important here, we note that Walter did introduce several of Johnson's prior convictions (and several bad acts including perjury, another possession of a firearm by a felon, destruction of evidence, and failure to register as a sex offender). Such evidence arguably undermined Johnson's credibility. The State's use of these several convictions to impeach Johnson diminished the need to use the 1988 robbery and murder convictions for impeachment and, therefore, reduces their probative value. See *Jackson,* 11 S.W.3d at 341 (concluding State "could have relied on appellant's three recent theft convictions to impeach him" and "other prior convictions drastically lessened the State's need to impeach with the remote convictions for aggravated rape and a crime against nature").

The trial court did not abuse its discretion in excluding evidence of Johnson's prior second-degree murder and aggravated robbery convictions under these circumstances. Since the value of convictions for such violent offenses has traditionally been questioned and, here, is less than its prejudicial effect, and since there was significant other evidence serving to impeach Johnson, we overrule Walter's point of error.

*(3) The Trial Court Did Not Abuse Its Discretion by Changing Venue to Collin County*

On its own motion, the trial court changed venue to Collin County. Article 31.01 governs the trial court's sua sponte change of venue:

> Whenever in any case of felony or misdemeanor punishable by confinement, the judge presiding shall be satisfied that a trial, alike fair and impartial to

the accused and to the State, cannot, from any cause, be had in the county in which the case is pending, he may, upon his own motion, after due notice to accused and the State, and after hearing evidence thereon, order a change of venue to any county in the judicial district in which such county is located or in an adjoining district, stating in his order the grounds for such change of venue. The judge, upon his own motion, after ten days notice to the parties or their counsel, may order a change of venue to any county beyond an adjoining district; provided, however, an order changing venue to a county beyond an adjoining district shall be grounds for reversal if, upon timely contest by the defendant, the record of the contest affirmatively shows that any county in his own and the adjoining district is not subject to the same conditions which required the transfer.

TEX.CODE CRIM. PROC. ANN. art. 31.01 (Vernon 2006). The trial court complied with the notice provisions and heard Walter's objections to venue in Collin County.

In its notice of intent to change venue, the trial court cited extensive "notoriety and pre-trial publicity" as grounds for the venue change. Walter does not challenge the trial court's decision to change venue from Bowie County; he challenges the trial court's decision to change venue *to Collin County.* Collin County lies outside any judicial district adjoining the Fifth Judicial District in which the case was originally filed. He argues that the trial court could and should have transferred the case to Lamar County, which lies within the Sixth Judicial District and adjoins the Fifth District. Walter wanted the case transferred to Lamar County because its demographic composition more closely resembles that of Bowie County in terms of African–American residents.

At the hearing and in the briefs, parties discuss both the amount of publicity and the availability of facilities in Lamar County. Walter presented testimony from a cable television employee that Lamar County receives channels from the Dallas/Fort Worth-based media, rather than Texarkana/Shreveport sources. He also presented evidence that only one copy of the *Texarkana Gazette* went to Lamar County and that one was sent to the *Paris News.* Therefore, he argues, he did show that the high-publicity conditions present in Bowie County which called for a change in venue were not present in Lamar County.

The State presented three articles published in the *Paris News* the week following the murders. The article cites the *Texarkana Gazette* and gave full coverage of the murders. The third article detailed the charges brought against Walter and Henson, and provided extensive information concerning how the investigation led to their indictments. Additionally, the State offered the testimony of Bill Feazell concerning the massive renovation that the Lamar County courthouse was undergoing at the time. During the renovation, proceedings in Lamar County were being held at the old post office building and, as a result, courtroom space was very limited for the courts already there.

Noting that Lamar County had practical limitations at the time and that the Fifth Judicial District Court could not force Lamar County to make appropriate accommodations, the trial court concluded that the same conditions surrounding the publicity of the murders and the unavailability of facilities in Lamar County made Collin County the best choice:

Well, based on the matter that we've discussed, I'm going to overrule the motion. I do not believe, first of all, that the defendant has established that La-

mar County is not subject to the same conditions that are required to transfer in this case. Based on State's Exhibit One, it's apparent that Lamar County has also had media publications regarding this particular case, so I'm not satisfied that the defendant's met his burden under the statute. But second of all, even if that burden had been met, as a practical matter, Lamar County simply does not have the facilities available now or for the foreseeable future in which to try this case, and though it's not a factor that's stated in the statute, as a practical matter, it simply would have to be something for the Court to take into consideration. There's just not a place available to try the case. No matter how much the Court would desire to go there, it just can't be accomplished. So for those reasons, I'm going to deny the objection, overrule the objection to the transfer and this case will proceed onto Collin County.

On appeal, Walter again urges that the publicity in Lamar County did not rise to the level of that in Bowie County, which made a change in venue appropriate. He also contends that the concerns about the facilities and security in Lamar County are not valid considerations when the trial court must decide whether to change venue to a location outside an adjoining judicial district. Therefore, Walter argues that, in light of his timely contest, the trial court was required to transfer the case to Lamar County, and that the transfer to Collin County calls for reversal.

▇▇ We review a trial court's decision regarding change of venue under Article 31.01 for an abuse of discretion. *See Cook v. State,* 667 S.W.2d 520, 522 (Tex.Crim. App.1984). And we turn our attention to three cases addressing this matter: *Brimage v. State,* 918 S.W.2d 466 (Tex.Crim. App.1996) (op. on reh'g); *Aranda v. State,*

736 S.W.2d 702 (Tex.Crim.App.1987); and *Bath v. State,* 951 S.W.2d 11 (Tex.App.-Corpus Christi 1997, pet. ref'd).

In *Brimage,* the Texas Court of Criminal Appeals made clear that the abuse of discretion standard of review still applied when the trial court changed venue to a location outside an adjoining judicial district. *Brimage,* 918 S.W.2d at 508. *Brimage* involved the trial court's sua sponte transfer of the capital murder case from Kleburg County to Comal County, a county located outside any judicial district adjoining the district in which Kleburg County was located, the 105th Judicial District. *Id.* at 507. Like Walter, Brimage did not insist on being tried in Kleburg County. Instead, he argued he could receive a fair trial elsewhere in the 105th Judicial District or in an adjoining district. *Id.* at 508. In its highly deferential review, the *Brimage* court concluded that the trial court "balanced evidence of possible bias created by significant pretrial publicity in the 105th Judicial District and surrounding judicial districts with contrary evidence produced by the appellant" to arrive at its decision and did not abuse its discretion in ordering a change of venue to a county outside an adjoining district. *Id.*

In *Aranda,* the Texas Court of Criminal Appeals reviewed a trial court's order, on its own motion, changing venue in a capital murder case from Webb County (in the 49th Judicial District) to Victoria County (in the 24th Judicial District). *Aranda,* 736 S.W.2d at 703. In its order, the trial court concluded a fair and impartial trial "could not be had in Webb County, or other counties in the 49th Judicial District or in any counties adjoining said district" due to massive publicity. *Id.* at 705. The *Aranda* court noted there was evidence that the offense, the various proceedings, and the separate trial of Aranda's brother on the same charges were "widely cov-

ered" by the media. *Id.* The court also pointed out that newspaper articles provided details of Aranda's and his brother's confessions. *Id.* From the detailed examination, we note that the nature, not simply the volume, of the publicity, is relevant to the trial court's decision to change venue to a county beyond an adjoining district. Again, we note the highly deferential review of the trial court's decision "in passing upon the question of a change of venue": "When there is conflicting evidence on the issue, a court's decision regarding change of venue will not normally be considered an abuse of discretion." *Id.*

Another transfer from Webb County was at issue in *Bath.* After considering evidence on the publicity in Webb and surrounding counties, and evidence of the ability of those surrounding counties "to provide the facilities, personnel, or security," the trial court first transferred the pending capital murder case to Bexar County, a county beyond an adjoining judicial district:

> Simply stated, I question whether Webb County could visit on one of the rural, small counties, the task of trying a capital murder case. Not because of the nature of this case or because of the dangerousness of anyone or the danger to the witnesses or the defendant, the Sheriff's departments to handle the traffic and just the matter of security that goes with this type of trial. Not having heard any evidence as to why it should go into one [of] these adjoining counties, even though some evidence was presented concerning the ability of the different Sheriff's departments. My own experience in Zapata tells me that it is indeed a very, very difficult task to select the jury and try the case and provide adequate security for all concerned.

*Bath,* 951 S.W.2d at 21–22. When Bexar County could not provide "a timely court-room," the trial court transferred the case to Nueces County (in the 28th Judicial District), beyond an adjoining judicial district.

Bath argued the record failed to show cause for changing venue to a location beyond an adjoining judicial district. *Id.* at 21. To that, the Corpus Christi court of appeals responded that "valid concerns necessitated the transfer of the case to a county in a non-adjoining judicial district." The court went on to conclude, in language mirroring Article 31.01, that the record showed all counties in the adjoining judicial district were subject to the same conditions that necessitated a transfer. *Id.* at 22. While there was substantial evidence regarding the level of publicity in surrounding counties, it is important to note that the trial court also heard a good amount of evidence on the capacity of those counties to handle a capital murder case in terms of facilities and security. The Corpus Christi court labeled these considerations as "valid concerns." *Id.*

Here, we see evidence both supporting and undermining the position that Lamar County was not subject to the same conditions that called for a transfer of the case from Bowie County. In light of this conflicting evidence on the nature and extent of publicity in Lamar County, we hold that the trial court did not abuse its discretion by changing venue to Collin County. We add that the trial court's consideration of other, practical concerns is consistent with Texas law. The Corpus Christi court in *Bath* upheld the trial court's decision to change venue to a county beyond an adjoining district when the trial court heard conflicting evidence on the issue of publicity and evidence that potential locations, regardless of publicity concerns, were not equipped to undertake a capital murder trial. *See id.* The Texas Court of Criminal Appeals refused Bath's petition for dis-

cretionary review, and the United States Supreme Court denied Bath's petition for writ of certiorari, suggesting that the Corpus Christi court's reasoning in *Bath* was sound. Indeed, the trial court is given a considerable amount of discretion on issues of venue. With that in mind, we also expressly reject Walter's argument that the trial court's consideration of the practical limitations present in Lamar County during the time were irrelevant.

*(4) The Trial Court Did Not Err by Denying Walter's Motion to Quash Indictment*

██ Walter contends the trial court erred by denying his motion to quash the indictment, urged on the basis that unauthorized persons were present during the grand jury proceedings. *See* Tex.Code Crim. Proc. Ann. art. 20.011(a) (Vernon 2006). We emphasize that, here, no unauthorized persons were present during grand jury *deliberations*. *See* Tex.Code Crim. Proc. Ann. art. 20.011(b) (Vernon 2006).

██ The State stipulated to the presence of several Texarkana police officers during grand jury testimony. None of these officers testified before the grand jury, and only a few testified at trial. The State argued at trial, as it does in its appellate brief, that Article 20.011(a)(4) relating to witnesses allows for the presence of *potential* witnesses at trial as well as witnesses before the grand jury.[7] We disagree with this interpretation; since the State stipulated to the presence of officers who were not witnesses before the grand jury, the record supports the conclusion that the State violated Article 20.011.

*(a) Historical Perspective*

Traditionally, Texas cases have consistently maintained the distinction between presence during grand jury testimony and presence during grand jury deliberations. *See Ex parte Rogers*, 640 S.W.2d 921, 924 (Tex.Crim.App.1982); *Ray v. State*, 561 S.W.2d 480, 481 (Tex.Crim.App.1977); *Hernandez v. State*, 791 S.W.2d 301, 305 (Tex.App.-Corpus Christi 1990, pet. ref'd).

In one of the early decisions concerning the presence of unauthorized people in the grand jury room during testimony, a sheriff accompanied the young, female complainant into the grand jury room. *See Tinker v. State*, 95 Tex.Crim. 143, 253 S.W. 531, 532 (1923). The sheriff remained present while she was being questioned. *Id.* The Texas Court of Criminal Appeals pointed out that no one was present while the grand jury deliberated:

> This court has held, in regard to the presence of persons acting in various capacities during the investigation of crime, that such presence, extending no further than while testimony was being had before the grand jury, would not come within the forbiddance of such presence while the said grand jury was deliberating upon the finding of the indictment.

*Id.* (citing *Moody v. State*, 57 Tex.Crim. 76, 121 S.W. 1117 (1909); *McElroy v. State*, 49 Tex.Crim. 604, 95 S.W. 539 (1906)).

In *Minton v. State*, detectives, other than the one detective who testified before the grand jury, were present in the grand jury room to hear testimony. 468 S.W.2d 426, 432 (Tex.Crim.App.1971). The detective who did testify remained in the room "to coordinate the testimony of the witnesses." *Id.* Again, the court pointed out that the detectives were not present during grand jury deliberations and concluded there was no error:

---

7. Had the State attended oral argument at this Court's invitation, it may have more thor-

oughly explained its interpretation of Article 20.011(a).

The Texas rule is that "when the jurors are not deliberating or voting the presence of persons who have official business in the jury chamber, such as police officers or stenographers, is *not discountenanced*." 27 Tex. Jur.2d 261, Sec. 44. *See: Lopez v. State*, 158 Tex.Crim. 16, 252 S.W.2d 701; *Tinker v. State*, 95 Tex.Crim. 143, 253 S.W. 531.

However, better practice would dictate that only the prosecutor, reporter, if any, and such witnesses that are testifying be present.

*Id.* (emphasis added).[8] "Discountenance" is "to treat or regard with disfavor." WEBSTER'S II NEW COLLEGE DICTIONARY (2d ed.2001).

*(b) Codification of the "Better Practice" Rule*

If the presence of unauthorized people during grand jury testimony was not disfavored, it became at least somewhat more disfavored in 1995 when the Legislature passed Article 20.011, effectively codifying what had historically been deemed "the better practice." Again, no cases construe or apply Article 20.011. We must apply the plain language of Articles 20.011 and 27.03 to determine whether there is no error when unauthorized people are in the grand jury room during testimony.

*(c) Construction of Articles 20.011 and 27.03*

Article 20.011 of the Texas Code of Criminal Procedure became effective September 1, 1995, and limits who may be present during both grand jury proceedings and grand jury deliberations:

(a) Only the following persons may be present in a grand jury room while the grand jury is conducting proceedings:

(1) grand jurors;

(2) bailiffs;

(3) the attorney representing the state;

(4) witnesses while being examined or when necessary to assist the attorney representing the state in examining other witnesses or presenting evidence to the grand jury;

(5) interpreters, if necessary; and

(6) a stenographer or person operating an electronic recording device, as provided by Article 20.012.

(b) Only a grand juror may be in a grand jury room while the grand jury is deliberating.

TEX.CODE CRIM. PROC. ANN. art. 20.011 (Vernon 2006). Notably absent in Article 20.011 is a specific remedy for a violation of the rule. It is also quite significant that Article 20.011 addresses the presence of unauthorized persons both in grand jury proceedings and in grand jury deliberations.

Article 27.03 specifically provides circumstances in which an indictment may be set aside:

*In addition to any other grounds authorized by law*, a motion to set aside an indictment or information may be based on the following:

1. That it appears by the records of the court that the indictment was not found by at least nine grand jurors, or that the information was not based upon a valid complaint;

**8.** *See also Baldwin v. State*, 478 S.W.2d 476, 478 (Tex.Crim.App.1972) (citing long-standing rule such presence "not discountenanced" and concluding no reversible error shown); *Harris v. State*, 450 S.W.2d 629, 630 (Tex. Crim.App.1970) (holding Article 27.03(2), authorizing dismissal based on presence of unauthorized people during deliberations, means more than "mere examination of witnesses").

2. *That some person not authorized by law was present when the grand jury was deliberating upon the accusation against the defendant, or was voting upon the same; and*

3. That the grand jury was illegally impaneled; provided, however, in order to raise such question on motion to set aside the indictment, the defendant must show that he did not have an opportunity to challenge the array at the time the grand jury was impaneled.

TEX.CODE CRIM. PROC. ANN. art. 27.03 (Vernon 2006) (emphasis added). We note that Article 27.03 refers to the presence of unauthorized persons during grand jury deliberations only. So, the presence of unauthorized persons during grand jury testimony can be a basis for setting aside the indictment only if Article 20.011 serves as authority to do so. That is, only if Article 20.011's list of authorized persons would qualify as "other grounds authorized by law" under Article 27.03, may Walter seek to set aside the indictment on the basis that unauthorized persons were present during testimony before the grand jury. We conclude that Article 20.011 does not authorize an indictment to be set aside on the ground that unauthorized persons were present during grand jury testimony.

*(d) Article 20.011 Does Not Authorize Setting Aside the Indictment Based on Presence of Unauthorized Persons During Grand Jury Testimony*

It is a well-settled rule of statutory construction not to interpret laws in such a way as to render useless an act of the Legislature. We, therefore, presume that, in enacting legislation, the Legislature did not do a "useless thing." *See Childress v. State,* 784 S.W.2d 361, 364 (Tex.Crim.App. 1990); *Heckert v. State,* 612 S.W.2d 549, 552 (Tex.Crim.App.1981); *see also* TEX. GOV'T CODE ANN. § 311.021(2) (Vernon

2005) (providing "it is presumed that the entire statute is intended to be effective"). Generally, courts are also to presume that every word in a statute has been used for a purpose and each word, phrase, clause, and sentence should be given effect if reasonably possible. *State v. Hardy,* 963 S.W.2d 516, 520 (Tex.Crim.App.1997); *State v. Verhoeven,* 151 S.W.3d 637, 640 (Tex.App.-Fort Worth 2004, pet. ref'd). To achieve this, we must focus "on the literal text of the statute in question and attempt to discern the fair, objective meaning of that text at the time of its enactment." *See Ex parte Spann,* 132 S.W.3d 390, 393 (Tex.Crim.App.2004); *Boykin v. State,* 818 S.W.2d 782, 785 (Tex. Crim.App.1991). In doing so, we may consider, among other things, "common law or former statutory provisions, including laws on the same or similar subjects." *See* TEX. GOV'T CODE ANN. § 311.023(4) (Vernon 2005).

We apply these rules of statutory construction to determine whether Article 20.011 calls for an indictment to be set aside when the record shows that unauthorized persons were present during the grand jury testimony. To determine this issue, we return to our earlier observation regarding Article 20.011: while Article 20.011 forbids unauthorized persons to be present with a grand jury during both testimony and deliberations, it does not specify a remedy for either situation. *See* TEX.CODE CRIM. PROC. ANN. art. 20.011.

That said, we also re-examine what Article 27.03 does and does not do. Article 27.03 provides that an information or indictment may be set aside when unauthorized persons have been present during grand jury *deliberations,* but it makes no reference at all to the presence of unauthorized persons during grand jury *testimony.* In other words, Article 27.03 provides a specific remedy, but with respect to only

the *deliberations*, not the *testimony*, referenced in Article 20.011. *See* Tex.Code Crim. Proc. Ann. art. 27.03(2). Therefore, treating Article 20.011's proscriptions as providing "other grounds authorized by law," to set aside an information or indictment, would necessarily render Article 27.03(2)—specifically providing a remedy for unauthorized presence during grand jury deliberations—an unnecessary repetition of what Article 20.011 could accomplish as "other grounds." Article 27.03(2) simply would not be necessary if Article 20.011 authorized setting aside the indictment for unauthorized presence during grand jury testimony and deliberations.

To further illustrate, it is helpful to first reconcile the two articles with respect to grand jury deliberations. Article 20.011(b) identifies who may be present during grand jury deliberations—only grand jurors. Article 27.03(2) then authorizes the trial court to set aside an indictment if a defendant shows that unauthorized persons were present during those deliberations. Similarly, Article 20.011(a) identifies who may be present during testimony before the grand jury. However, there is no specific provision authorizing setting aside the indictment on that basis. The "any other grounds" language cannot be used because, again, to do so would render Article 27.03(2) useless and redundant.

In order to accept Walter's position, we would have to treat Article 27.03(2) as a redundant provision. We are bound by rules of statutory construction not to interpret legislation in such a manner as to render a provision useless. *See Fearance*

*v. State*, 771 S.W.2d 486, 522 (Tex.Crim. App.1988) (enactment of redundant legislation a "useless thing"). We cannot conclude Article 20.011, as "other grounds" does, in part, what Article 27.03(2) does specifically. To do so would make Article 27.03(2) unnecessary. Therefore, Article 20.011 does not authorize the setting aside of the indictment on the basis that unauthorized persons were present during grand jury testimony.[9]

**(5) The Trial Court Did Not Abuse Its Discretion by Granting the State's Challenges for Cause**

 Walter complains the trial court erroneously granted the State's challenges for cause regarding five jurors who indicated they would hold the State to a standard of proof higher than beyond a reasonable doubt.[10]

 It is left to the discretion of the trial court to first determine whether bias exists. *Anderson v. State*, 633 S.W.2d 851, 854 (Tex.Crim.App.1982). An erroneous decision by a trial court to grant the State's challenge for cause will result in a reversal of the conviction only if the appellant can show that he or she was deprived of a lawfully constituted jury as a result of the trial court's action. *See Feldman v. State*, 71 S.W.3d 738, 749 (Tex.Crim.App. 2002); *Jones v. State*, 982 S.W.2d 386, 394 (Tex.Crim.App.1998).

 A challenge for cause may be made by the State if a juror has a bias or prejudice against any phase of the law on which the State is entitled to rely for

---

9. Nor does it serve as a basis for setting aside the indictment because unauthorized persons were present during the grand jury's deliberations; Article 27.03(2) plainly does that.

10. In the same analysis, Walter also argues that the trial court erred by refusing to submit a definition of reasonable doubt in the jury charge. We can readily dispose of that issue,

however. The Texas Court of Criminal Appeals has specifically held that a "reasonable doubt" definition is not required. *See Paulson v. State*, 28 S.W.3d 570, 573 (Tex.Crim. App.2000). We applied *Paulson* in *Rogers v. State*, 85 S.W.3d 359, 362 (Tex.App.-Texarkana 2002, no pet.).

conviction or punishment. TEX.CODE CRIM. PROC. ANN. art. 35.16(b)(3) (Vernon 2006). Bias is an inclination toward one side of an issue that leads to a natural inference that the juror will not act with impartiality; prejudice is prejudgment. *See Anderson,* 633 S.W.2d at 853. When a juror indicates this type of bias as a matter of law, he or she *must* be excused despite any protestations by the juror of an ability to set the bias aside and be fair and impartial. *See Clark v. State,* 717 S.W.2d 910, 917 (Tex. Crim.App.1986); *Anderson,* 633 S.W.2d at 854; *Mize v. State,* 754 S.W.2d 732, 742 (Tex.App.-Corpus Christi 1988, pet. ref'd).

Here, five prospective jurors—those assigned numbers 44, 45, 53, 127, and 154— indicated that, when faced with the facts of a case in which the State seeks the death penalty, he or she would hold the State to a standard of proof higher than beyond a reasonable doubt. For instance, Juror 44 explained that he would have to be "absolutely sure without any doubt" in a death penalty case. Jurors 45 and 127 were, initially, less emphatic than the others and, on the defense's request, the trial court spoke with those two individually regarding their positions on the standard of proof. Both jurors clarified that they could not hold the State to the beyond-a-reasonable-doubt standard, that the State would have to prove its case more convincingly. None of the challenged jurors ever wavered on his or her position by trying to state that he or she could put aside his or her personal position and follow the law. Each consistently indicated that they would have to be convinced by a standard higher than the beyond-a-reasonable-doubt standard.

Therefore, we conclude that the trial court did not abuse its discretion by determining that these five jurors were biased against the law to be applied in this case. Based on the rule in *Anderson* and *Clark*

that a juror who has demonstrated bias as a matter of law must be excused, we conclude the trial court properly granted the State's challenges for cause and overrule Walter's point of error.

*(6) The Trial Court Did Not Err by Refusing to Include an Aggravated Robbery Instruction*

 A defendant is entitled to the submission of a lesser offense if a two-pronged test is met: (1) the lesser-included offense must be included within the proof necessary to establish the offense charged, and (2) some evidence must exist in the record that would permit a jury rationally to find that, if the defendant is guilty, he or she is guilty only of the lesser offense. *See Solomon v. State,* 49 S.W.3d 356, 368–69 (Tex. Crim.App.2001).

 Pursuant to Section 19.03(a)(7)(A) of the Texas Penal Code, the State alleged that Walter

did unlawfully then and there intentionally cause the death of an individual, Chrystal Willis by shooting Chrystal Willis with a firearm and did then and there intentionally cause the death of an individual, Rebecca Shifflett by shooting Rebecca Shifflett with a firearm and did then and there intentionally cause the death of an individual, Matthew Hines by shooting Matthew Hines with a firearm and all murders were committed during the same criminal transaction.

That is, the State characterized the offense as capital murder by virtue of there being three victims murdered in the same criminal transaction. While the State may have charged Walter with capital murder by alleging that he committed murder in the course of committing aggravated robbery, it did not do so. *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (Vernon Supp.2006). Nevertheless, Walter argues that the trial court erred by refusing to include his requested instruction on aggravated robbery.

Aggravated robbery is not included within the proof necessary to establish that Walter murdered three people in one criminal transaction. Further, even if the first prong were satisfied, we note that there is no evidence that, if Walter is guilty, he is guilty only of aggravated robbery. While Walter denied having shot the victims, he also denied having gone to the restaurant at all that night. Therefore, his testimony does not suggest that, if he is guilty, he is guilty only of aggravated robbery. No other evidence in the record suggests that Walter did not shoot the three victims.

Walter cites *Broussard v. State* to support his position. 642 S.W.2d 171, 173 (Tex.Crim.App.1982). However, we distinguish *Broussard* by pointing out that the State in *Broussard* had alleged capital murder as murder during the commission of robbery. *Id.* Such is not the case here; *Broussard* is inapplicable to these facts. The trial court did not err by refusing to include a charge on aggravated robbery.

Having overruled all of Walter's points of error, we affirm the trial court's judgment.