COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

KEDRICK SLAUGHTER, § 

           Appellant, § 

No. 08-06-00291-CR

v. §

Appeal from the

THE STATE OF TEXAS, §

292nd Judicial District Court

§

of Dallas County, Texas

           Appellee. §

(TC# F-06-00894-V)

§

**O P I N I O N**

This is an appeal of a capital murder conviction. Appellant argues that the evidence is factually insufficient to support the conviction, that an implied finding against the self-defense issue is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust, and that the trial court erred in admitting hearsay statements. Appellant was given the mandatory life sentence. *See* TEX.PENAL CODE ANN. § 12.31 (Vernon 2003). We affirm.

Early Christmas day in 2004, Jamie Jackson died from multiple gunshot wounds from an automatic weapon. Kedrick Slaughter was charged with capital murder for shooting Jamie Jackson for the promise of remuneration.

At trial, Shreka Chambers testified as to events leading up to and after the shooting. Shreka's boyfriend and father of her child, Charles Van Zandt or "Chad," told her that his best friend CD, a drug dealer, asked him to find someone to kill Mr. Jackson because he had "shorted [him] half a big," meaning robbed him of some drugs. CD would pay whoever killed him $15,000. The next time she heard anything about the shooting was about a month before at her

home while Chad and her cousins, Kedrick and Tim were talking about it. Chad told Kedrick that CD was looking for someone to "find" somebody. Kedrick said he would do it because he needed the money for Christmas. Chad then told Tim and Kedrick that they would be paid $15,000 to get Mr. Jackson. Kedrick and Tim understood that Chad was talking about killing Mr. Jackson.

On December 24, 2004, Ms. Chambers was at her house with her sister, her sister's boyfriend, Chad, and Kedrick's girlfriend, Crystal Williams. Kedrick and Tim showed up around ten or eleven p.m. They arrived in a burgundy van owned by D, Ms. Chambers' Aunt Paulette's boyfriend. They were there to pick up Chad. Chad followed the two in his own car. Chad returned some time after midnight. Chad told her he had gotten lost. Around one or two a.m., Appellant and Tim returned to the house. They banged on the door to get a hold of Chad. Chad went with them to the living room. Ms. Chambers went to the living room, and saw both Appellant and Tim with guns. Tim had a black handgun, and Kedrick had a longer gun with a clip hanging from the bottom of it. Ms. Chambers identified the type of gun Kedrick was holding that night in a photograph shown by the State. Ms. Chambers heard Appellant tell Chad to call CD for his money because he had "just killed that nigger." The three heard Ms. Chambers and Ms. Williams eavesdropping so they went outside of the home.

The next time she heard anything about what happened that night was the morning the article about the shooting came out. Paulette came over to Ms. Chambers apartment with the article because her boyfriend's van was in it. Paulette said that she was not going to let him go down for what had happened. Paulette told Kedrick, her son, to get rid of the van. On cross-examination, Ms. Chambers admitted to not giving all of the facts to the detective who

-2-

interviewed her regarding the shooting, and in fact gave very little of the information she testified to at trial.

Tarlisa King testified about the car ride where Mr. Jackson was shot. Mr. Jackson picked up Ms. King and her child from a friend's house to take them home. During this trip, they made a couple of stops so that Mr. Jackson could complete some drug deals. Upon arriving at their second stop, Mr. Jackson woke Ms. King telling her that they were being followed by a van. They left, and turned in front of the van causing it to stop. The van turned around and continued to follow them. Mr. Jackson could not find his phone, so they headed back towards their second stop. During this time, they lost sight of the van, and Mr. Jackson found his phone. After losing the van, they went to Mr. Jackson's baby's mother's house. Mr. Jackson entered the home, and Ms. King noticed the van pass by again. She told Mr. Jackson that she had seen the van again. At this point, the van had been following them for twenty to thirty minutes not including the period in which they had lost it. Mr. Jackson pulled out his gun, and cocked it. When they pulled out of the apartment complex, Mr. Jackson saw the van parked to the side. They left the complex, but Mr. Jackson wanted to see who was following them. They turned around, and he stopped his car in front of the van. Mr. Jackson yelled at them "who are y'all? Show y'all face, I'm about to bust." He had his gun in his hand while doing this. "I'm about to bust" means I'm going to shoot. Ms. King convinced him to leave, but he turned around again, and again yelled at them as to who they were. There was no response from the van. They leave, and Mr. Jackson turns around yet again. The van turns on and pulls out, but stops on the street facing them. The van then begins to advance, and Mr. Jackson starts heading towards the van. Mr. Jackson told Ms. King to get down, and pushed her to the floor of the car. Immediately, she heard shots fired.

Ms. King could not tell whether Mr. Jackson fired his gun. Their car then jumped the curb, and ran into a tree. Mr. Jackson had been shot, and was not responding. Ms. King provided the police with a description of the van and its license plate number. In her statement to the police, she said Mr. Jackson also waived his gun at the van, while saying "Come on, come on, come on."

Ms. Shelly Ransom testified that on the night of the shooting, she received calls from both Mr. Jackson and Ms. King. Mr. Jackson told Ms. Ransom that he was being followed by a red and white van. He seemed nervous and scared. Ms. King described to Ms. Ransom how they were being followed by the van, and that they lost it, but it found them again.

Ms. Tishida Joshua testified that she received a phone call from Paulette inquiring about her son. Paulette asked her if Appellant had any money. She said to tell her son that she knew something he had done, and if she did not get her money, then she was going to turn him in.

Two inmates who were held in the same tank as Appellant testified. Mr. Simon Ramos heard Appellant boast about his pending charges in a newspaper article. Appellant told them that one day they were driving around, and saw someone who had stolen some drugs from them. His friends encouraged him to go get him, and he got out of the van with an AK, and started shooting. Mr. David Richie testified that he did not hear Appellant bragging or talking about his charges. He stated that he and Mr. Ramos were reading an article, and heard the officer say Appellant's name, and realized it was him whom they were reading about in the newspaper.

Ms. Crystal Williams, Appellant's girlfriend, testified for the defense. She never heard Chad, Tim, and Kedrick talking about money for killing someone or needing to find someone to do the job. The morning of Christmas Eve they were at Ms. Chambers house, but they left to her grandmother's house. Kedrick was with her, but he left at one point during the night. They were

-4-

not at Ms. Chambers' house the night of Christmas Eve. He returned, and they went to a party at her mother's house, and stayed the night there. The incident, where Appellant and Tim showed up at Shreka's house with guns saying they killed someone, never occurred according to Ms. Williams.

Heather Thomas, a firearm and toolmark examiner, testified she examined five bullet casings found at the scene. These types of bullets are commonly fired by AK-47 type rifles. The AK-47 has a banana-shaped clip. Lynn Salzberger, a medical examiner, testified that Mr. Jackson's cause of death was multiple gunshot wounds.

In Appellant's first two issues, he raises only a factual sufficiency challenge to the evidence, therefore our factual sufficiency analysis presumes that the evidence is legally sufficient. *See Clewis v. State*, 922 S.W.2d 126, 134 (Tex.Crim.App. 1996). In reviewing the factual sufficiency of the evidence, we must determine whether considering all the evidence in a neutral light, the fact finder was rationally justified in finding guilt beyond a reasonable doubt. *Zuniga v. State*, 144 S.W.3d 477, 484 (Tex.Crim.App. 2004), *overruled on other grounds by Watson v. State*, 204 S.W.3d 404 (Tex.Crim.App. 2006); *see also Clewis*, 922 S.W.2d at 129. Evidence is factually insufficient if it is so weak that it would be clearly wrong and manifestly unjust to allow the verdict to stand, or the finding of guilt is against the great weight and preponderance of the evidence. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex.Crim.App. 2000). Our evaluation should not intrude upon the fact finder's role as the sole judge of the weight and credibility given to any witness's testimony. *Cain v. State*, 958 S.W.2d 404, 407 (Tex.Crim.App. 1997). The appellate court may substitute its judgment for the jury's on the question of witness credibility and weight of evidence determinations, "albeit to a very limited degree." *See*

*Marshall v. State*, 210 S.W.3d 618, 625 (Tex.Crim.App. 2006). An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant's complaint on appeal. *Sims v. State*, 99 S.W.3d 600, 603 (Tex.Crim.App. 2003). We will not set aside a judgment unless the evidence supporting the verdict is so weak as to be clearly wrong and manifestly unjust. *Zuniga*, 144 S.W.3d at 481. A clearly wrong and manifestly unjust verdict occurs where the jury's finding shocks the conscience or clearly demonstrates bias. *Id*. In a factual sufficiency analysis, the existence of alternative reasonable hypotheses raised by the record may be considered, but they are not determinative. *Wilson v. State*, 7 S.W.3d 136, 141 (Tex.Crim.App. 1999). When a defendant identifies an alternative reasonable hypothesis raised by the evidence, the standard of review remains the same, and a verdict may be overturned only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Clewis*, 922 S.W.2d at 129.

In Issue One, Appellant argues that the evidence is factually insufficient to support the capital murder conviction. Specifically, Appellant argues the State failed to prove Appellant was the shooter or criminally responsible for the murder. A person commits capital murder if the person commits murder defined under Section 19.02(b)(1), and the person commits the murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration. TEX.PENAL CODE ANN. § 19.03(a)(3)(Vernon Supp. 2008). Murder is defined as intentionally or knowingly causing the death of an individual. TEX.PENAL CODE ANN. § 19.02(b)(1)(Vernon 2003). Shreka Chambers testified that she was told by her boyfriend, Chad, that CD was looking for someone to kill Mr. Jackson because he had stolen some drugs from him. At a later date, Ms. Chambers heard Appellant and Tim agree to

-6-

kill Mr. Jackson for $15,000. On Christmas Eve, Appellant and Tim came to her house in her Aunt Paulette's burgundy van to get Chad. They returned later that night holding guns, and stated that they had killed him and wanted their money from CD. Ms. Chambers' identified the type of gun Appellant was holding by its elongated clip. Ms. King testified that Mr. Jackson yelled at the van, showed his gun, and said he was about to shoot. Appellant argues that Ms. Chambers' testimony is insufficient because it is in direct conflict with testimony from Ms. Williams. Ms. Williams testified that she did not hear any conversations about killing someone for money, that they were not at Ms. Chamber's house on Christmas Eve, and Appellant never came back saying they had killed someone and wanted their money. Appellant also argues that her credibility must be viewed in the light that she stated it was Christmas morning when her Aunt Paulette came over angry about the newspaper article with her fiancee's van implicated in the shooting, which would be practically impossible given the time of the shooting and the time needed to print an article. However, she also testified that Paulette came over the morning the newspaper article came out, although on cross-examination she said it was Christmas morning. Appellant points out that her testimony at trial included facts that were not given in her interview with the detectives. Paulette told Appellant to get rid of the van. Appellant argues that no witness testified he was an occupant of the van or that he was the shooter. There was no evidence that he was ever in possession of a AK-type rifle. Appellant argues that Mr. Ramos' testimony of Appellant bragging about shooting Mr. Jackson is not credible. Mr. Ramos testified that Appellant's story was that he got out of the van and started shooting while Ms. King stated the shots came from inside the van. Also, Mr. Richie's testimony contradicted Mr. Ramos testimony stating that no conversation took place. Ms. Joshua testified that Appellant's mother,

-7-

Paulette, called her asking about her son, and stated that she knew something he did, and if she did not get some money she would turn him in. Appellant argues that the evidence raised the reasonable alternative hypothesis that Ms. Chambers falsely accused Appellant to protect Chad, the father of her child.

The jury could have found Ms. Chambers to be more credible than Ms. Williams, and taken her statements as the true account of what occurred. Ms. Chambers' testimony clearly showed Chad's involvement with the shooting of Mr. Jackson. Also, Appellant is Ms. Chambers' cousin, which weakens the argument that she would want to pin the murder on Appellant to protect Chad. They could also have chosen to believe Mr. Ramos over Mr. Ritchie as to the conversations that took place in jail. After a neutral review of the evidence, we hold the verdict is neither clearly wrong and manifestly unjust, nor is the conflicting evidence against the great weight and preponderance of the evidence. Appellant's Issue One is overruled.

When an appellant challenges the factual sufficiency of the evidence supporting the rejection of a claim of self-defense, we view all the evidence in a neutral light and ask whether the State's evidence taken alone is too weak to support the finding and whether the proof of guilt, although adequate if taken alone, is against the great weight and preponderance of the evidence. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex.Crim.App. 2003). In conducting this review, we bear in mind that the fact finder may draw reasonable inferences from the evidence, is the sole judge of the weight of the evidence and credibility of the witnesses, and may accept or reject any or all of the evidence produced by the parties. *Swearingen v. State*, 101 S.W.3d 89, 97 (Tex.Crim.App. 2003). We will reverse only when we can say with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the fact finder's verdict. *Watson*,

204 S.W.3d at 417. A person is generally justified in using deadly force against another if he reasonably believes deadly force was necessary to protect himself against the other's use or attempted use of unlawfully deadly force and a reasonable person in the actor's situation would not have retreated. TEX.PENAL CODE ANN. §§ 9.31(a), 9.32(a)(Vernon Supp. 2008). The self-defense evidence is that Mr. Jackson yelled at the van and said he was about to shoot. However, after making that statement, he drove off. Mr. Jackson turned around when he noticed the van pull up to the exit of the apartment complex. The two cars began to travel towards each other slowly. The self-defense theory would have been stronger immediately after Mr. Jackson had his gun visible, and was yelling that he was going to shoot. Appellant argues there was no evidence that the van did anything to provoke the confrontation, which would cause it to lose its right to self-defense. However, some time passed since the threat was made, and then the van began to advance towards the car. Also, the van had been following Mr. Jackson's car for thirty to forty minutes, and Appellant had entered into a conspiracy to murder Mr. Jackson. We find the evidence is neither too weak to support the jury's finding, nor is the evidence so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Appellant's Issue Two is overruled.

In Issues Three and Four, Appellant argues that the trial court erred in admitting hearsay statements offered by the State. An out-of-court statement offered for the truth of the matter asserted is hearsay and generally inadmissible. TEX.R.EVID. 801(d). There are many exceptions to the general rule that hearsay is inadmissible, one of which states:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability or to render invalid a claim by the declarant against another,

or to make the declarant an object of hatred, ridicule, or disgrace, that a reasonable person in declarant's position would not have made the statement unless believing it to be true. In criminal cases, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Tex.R.Evid. 803(24).

Whether a statement is admissible as a statement against interest requires a two-step analysis. *Bingham v. State*, 987 S.W.2d 54, 57 (Tex.Crim.App. 1999). The trial court first determines whether the statement tends to expose the declarant to criminal liability. *Id*. The court then looks to the corroborating evidence to see if it clearly indicates the trustworthiness of the statement. *Id*. In evaluating the trustworthiness of the statement, the courts should consider the following factors: whether the guilt of the declarant is consistent with the guilt of the defendant; whether the declarant was so situated that he might have committed the crime; the timing of the declaration; the spontaneity of the declaration; the relationship between the declarant and the party to whom the statement is made; and the existence of independent corroborative facts. *Dewberry v. State*, 4 S.W.3d 735, 751 (Tex.Crim.App. 1999). When the State offers the statement to inculpate the defendant, the first two factors are not relevant. *Woods v. State*, 152 S.W.3d 105, 112 (Tex.Crim.App. 2004). The trial court's decision to admit or exclude a statement against interest is reviewed under an abuse of discretion standard. We will uphold the trial court's decision unless it lies outside the "zone of reasonable disagreement." *Montgomery v. State*, 810 S.W.2d 372, 390-91 (Tex.Crim.App. 1990)(op. on reh'g).

In Appellant's Issue Three, he argues the trial court erred in admitting statements made by Chad to his girlfriend Ms. Chambers. The court heard the evidence the State wanted to present and arguments outside the presence of the jury. Ms. Chambers stated that Chad was trying to

help out with the situation at the time the statements were made. In the presence of the jury, Ms. Chambers testified that Chad told her his friend, CD, told him to find someone to kill Mr. Jackson for money. He told her that CD would pay whoever did it $15,000. It is clear that the statements tend to expose Chad to criminal liability. The statements show that he was a facilitator of a conspiracy to commit capital murder. He was supposed to find someone to kill Mr. Jackson on behalf of CD. We must now determine whether there are corroborating circumstances, which clearly indicate the trustworthiness of the statement. The declaration was made more than a month before the shooting, and a few days before soliciting Appellant and Tim to take the job. The statements were made spontaneously in response to questions from his girlfriend about what CD had wanted to talk about. Chad had no reason to lie to Ms. Chambers, his girlfriend and mother of his child. A statement is sufficiently trustworthy for purposes of Rule 803(24) when it is made to a relative. *Walter v. State*, 209 S.W.3d 722, 731 (Tex.App.-- Texarkana 2006, pet. granted). The conversation occurred prior to the shooting. The independent, corroborating facts include a later conversation Ms. Chambers heard between Chad, Appellant, and Tim where Chad offered them the job, and they accepted it. Ms. Chambers testified that Appellant and Tim returned to her apartment holding guns, saying they had killed him, and wanted their money. The van identified in the shooting belong to Appellant's mother's boyfriend, which Ms. Chambers' testified Appellant was driving the night of the shooting. There was conflicting testimony that Appellant bragged about the shooting while in jail. We find the decision to admit the hearsay within the "zone of reasonable disagreement," and thus the trial court did not abuse its discretion. Even if the court erred in admitting the statements, we find the error to be harmless. Error is harmless, if after examining the record as a whole, the appellate

-11-

court is reasonably assured the error either did not influence the jury's decision or had only a slight effect. *Garcia v. State*, 126 S.W.3d 921, 927 (Tex.Crim.App. 2004). Inadmissible evidence can be rendered harmless if other evidence at trial is admitted, and it proves the same fact that the inadmissible evidence sought to prove. *See Anderson v. State*, 717 S.W.2d 622, 628 (Tex.Crim.App. 1986); *Couchman v. State*, 3 S.W.3d 155, 160-61 (Tex.App.--Fort Worth 1999, pet. ref'd). Appellant only challenges the conversation between Chad and Ms. Chambers. The same information was later admitted when Ms. Chambers testified about the conversation between Chad, Appellant, and Tim. Appellant's Issue Three is overruled.

In Issue Four, Appellant argues the trial court erred in admitting statements made by Paulette, Appellant's mother, to Tishida Joshua. Ms. Joshua testified that she received a phone call from Paulette inquiring whether Appellant had any money. Paulette then stated she knew he had some money, and that if he went over or called to let him know that she knew something he had done, and if she did not get her money, she would turn him in. Paulette's statement does not tend to expose her to criminal liability. It is a rather vague statement that with some stretches could be seen as attempted extortion, but it would be difficult, if not impossible, to find her criminally liable for attempted theft based on those comments. *See* TEX.PENAL CODE ANN. § 31.02 (Vernon 2003) and § 31.03 (Vernon Supp. 2008). The comments were made after the shooting. The comments were spontaneous since Paulette contacted Ms. Joshua for no reason other than to try to find Appellant, so she could get money for her silence. The testimony came from the girlfriend of Tim, who was implicated in the shooting of Mr. Jackson. The corroborating facts showing the trustworthiness of this statement are not sufficient. Paulette's boyfriend's van was being used by Appellant and identified in the shooting. She had shown up

with a newspaper article about the shooting, and told Appellant to get rid of the van.  We hold the trial court erred in admitting the statements made by Paulette to Ms. Joshua.  While it was error to admit the statements, we find any error to be harmless.  The record shows other statements by Paulette implying Appellant's involvement in the murder were admitted through Ms. Chambers' testimony.  She told him to get rid of the van, and she was not going to let her boyfriend go down for what had happen.  There was other evidence showing that Appellant had agreed to kill Mr. Jackson for money.  There was testimony he returned to Ms. Chambers apartment stating that he had killed him, and wanted his money.  There was testimony from Mr. Ramos that he was boasting about the shooting while in jail.  There was sufficient evidence showing the admission of Paulette's statement would have had but a slight effect on the jury's decision.  We overrule Appellant's Issue Four.

Having overruled all of Appellant's issues on appeal, we affirm his conviction.


October 16, 2008

DAVID WELLINGTON CHEW, Chief Justice

Before Chew, C.J., McClure, and Carr, JJ.

(Do Not Publish)

-13-